**William Eugene OWEN, as Executor of the Estate of Caroline Pearson Payne, Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–Appellee.**

No. 87–1405.

United States Court of Appeals, Federal Circuit.

July 18, 1988.

Kenneth A. Pels, Borzilleri, Baker & Pels, Washington, D.C., argued for plaintiff-appellant. With him on the brief was Andrew F. Reish.

Maria A. Iizuka, Dept. of Justice, Washington, D.C., argued for defendant-appellee. With him on the brief were Roger J. Marzulla, Acting Asst. Atty. Gen., Frank W. Donaldson, U.S. Atty., Birmingham, Ala., Patricia N. Young and Martin W. Matzen. Also on the brief was Carolyn J. Lynch, U.S. Army Corps of Engineers, Washington, D.C., of counsel.

Before MARKEY, Chief Judge, FRIEDMAN, RICH, DAVIS, SMITH, NEWMAN, BISSELL, ARCHER and MAYER, Circuit Judges,* and BENNETT, Senior Circuit Judge.

BENNETT, Senior Circuit Judge.

Appellant William Eugene Owen, in his capacity as executor of the estate of Caroline Pearson Payne,[1] brought suit in the United States Claims Court against the United States, seeking compensation for losses allegedly incurred when dredging in the Tombigbee River by the Army Corps of Engineers (Corps) resulted in erosion which caused Payne's land and eventually her house to topple into the river. The Claims Court granted the government's motion for judgment on the pleadings, finding that the Tombigbee River was navigable water and that the government's activities were immunized from suit by its dominant naviga-

---

\* Circuit Judge Davis took no part in this in banc decision due to his death on June 19, 1988. Circuit Judges Nies and Michel took no part in the consideration or decision of this appeal.

The case was originally argued before a panel consisting of Circuit Judges Rich, Davis, and Bennett on December 4, 1987. An active judge not on the panel suggested in banc considera-

tion and the court so decides the case after receiving supplemental briefing by the parties.

1. Mr. Owen was substituted as the party in interest in this action following the death of Ms. Payne shortly after the filing of the complaint. For brevity and simplicity, we use the decedent's name in this opinion.

tional servitude. Specifically, the court held that the decisions in *Pitman v. United States*, 457 F.2d 975, 198 Ct.Cl. 82 (1972), and *Ballam v. United States*, 806 F.2d 1017 (Fed.Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1889, 95 L.Ed.2d 496 (1987), both of which were binding on that court, precluded any possible recovery of compensation for a Fifth Amendment taking under the facts alleged in the Payne complaint.

Having considered the present appeal in banc in order to clarify our precedents with respect to the scope of the government's navigational servitude, we now reverse the judgment of the Claims Court, overrule those portions of *Pitman* and *Ballam* which are inconsistent with the following opinion, and remand this case for further proceedings not inconsistent herewith.

## BACKGROUND

The Tennessee–Tombigbee Waterway Project was initially authorized by Congress in 1946.[2] The design for the component of the project relevant to this appeal, the Demopolis Lake Navigation Channel to extend navigation between Demopolis, Alabama, and the Tennessee River, was approved on April 28, 1976. As part of that project component, the Corps dredged and widened portions of the existing channel of the Tombigbee River and increased the arcs of certain river bends. Prior to commencing construction on the Demopolis Lake Navigation Channel, the Corps knew that the redesign of the existing river channel would result in increased erosion and sloughing of some property adjoining the river bed. However, the Corps decided that the cost of conducting a preconstruction study to identify those areas most likely to be affected by the resulting erosion and sloughing would exceed the cost of any after-the-fact acquisition by inverse condemnation of property specifically affected by the construction. Therefore, no such study was made nor was any fast land condemned or acquired by the government

prior to the actual construction, which took place between 1976 and 1978. *See Payne v. United States,* 730 F.2d 1434, 1435 (11th Cir.1984).

The Payne property was located on the banks of the Tombigbee River in Greene County, Alabama, along a portion of the river in which the construction took place. According to the complaint filed in this action, the Corps modified the course of the Tombigbee River "by dredging a large amount of the riverbed and the bank upstream and across from the Plaintiff's property." These actions allegedly caused the river channel to be somewhat straightened and the arc of the curve of the river bend upstream of the property to be increased. The complaint went on to allege that "[t]he activities of the United States Corps of Engineers caused the velocity of the current striking the riverbank adjoining the Plaintiff's property to be increased substantially." The alleged result of the increased river velocity was increased erosion of the river bank adjoining the Payne property to the point that the erosion eventually undermined her house and caused it to collapse into the river. According to the complaint, the house was uninhabitable after April 13, 1979.

In 1981, Payne brought suit in the United States District Court for the Northern District of Alabama, alleging that the government's construction activities constituted a taking of her property and were a violation of the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2674 (1982). The district court dismissed the Tucker Act taking claim without prejudice since Payne sought more than $10,000, the maximum permitted for Tucker Act claims brought against the United States in federal district courts. *See* 28 U.S.C. § 1346(a)(2). The district court then granted the government's motion for summary judgment on the FTCA claim, holding that the FTCA's discretionary function exception, 28 U.S.C. § 2680(a)

**2.** For an overview of the scope and history of the entire project, see generally *Environmental Defense Fund v. Alexander,* 614 F.2d 474 (5th Cir.), *cert. denied,* 449 U.S. 919, 101 S.Ct. 316, 66

L.Ed.2d 146 (1980), and *Environmental Defense Fund v. Corps of Eng'rs of the United States Army,* 348 F.Supp. 916 (N.D.Miss.1972), *aff'd,* 492 F.2d 1123 (5th Cir.1974).

(1982),[3] immunized the government from liability.

On appeal, the Eleventh Circuit affirmed, holding that the government's decision not to conduct any preconstruction studies to determine the location and extent of damages likely to result from the construction was a discretionary decision of the type exempt from review under the FTCA. *Payne*, 730 F.2d at 1436–37. Although affirming the district court's decision holding the government immune from tort liability, the Eleventh Circuit noted that Ms. Payne had a remedy in the Claims Court in which she could pursue her inverse condemnation action under the Tucker Act, 28 U.S.C. § 1491 (1982).

In February 1985, Ms. Payne filed the present action in the Claims Court. As noted, the government moved for judgment on the pleadings which was granted on the basis of the government's navigational servitude and the decisions in *Pitman* and *Ballam*.

## OPINION

### A. *Standard of Review*

Under the government's view of this case, it is very significant that the complaint contains no allegation or inference that the Corps raised the high-water level of the river or that the Corps had invaded Payne's property or otherwise caused the water to overflow her land. The government argues that the Fifth Amendment to the Constitution of the United States only mandates compensation for government takings of property, not for mere damage to property, and that there can be no taking without an actual physical invasion of the Payne property by the government. Furthermore, in the government's view, since all the construction occurred below the high-water mark within the bed of the river, any damage which resulted therefrom outside the river bed is merely indirect and consequential damage, which can-

not be held to be a compensable taking in light of the government's dominant navigational servitude. Finally, the government argues that Payne had no property interest in the uninterrupted natural flow of the Tombigbee River as against the government's authority to improve navigation under its dominant servitude.

However, a motion for judgment on the pleadings should be granted only where "it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of his claim." *Branning v. United States*, 215 Ct.Cl. 949, 950 (1977). Thus, regardless of whether the trial court is convinced that the plaintiff is unlikely to prevail at trial, the court should only grant a defendant's motion for judgment on the pleadings if the defendant is clearly entitled to judgment on the basis of the facts as the plaintiff has presented them. Therefore, in reviewing the grant of a judgment for the defendant on the pleadings, we must assume each well-pled factual allegation to be true and indulge in all reasonable inferences in favor of the nonmovant, Ms. Payne. *See Jewelers Vigilance Comm., Inc. v. Ullenberg Corp.*, 823 F.2d 490, 492, 2 USPQ2d 2021, 2023 (Fed.Cir.1987); *Wager v. Pro*, 575 F.2d 882, 884–85 (D.C.Cir.1976).

### B. *The Central Issue*

We agree that, for the purposes of this appeal, we must assume that the erosion resulting from the increased velocity of the Tombigbee River against the appellant's land occurred below the high-water mark. Furthermore, it is also undisputed here that there was no direct overflow of the appellant's property as it was erosion occurring below the high-water mark which undermined the land and house located above the high-water mark to the point that both land and house fell into the river. However, despite no allegation that the Corps itself invaded Ms. Payne's property,

3. Section 2680(a) provides that the United States cannot be sued under the FTCA for acts "based upon the exercise or performance or the failure to exercise or perform a discretionary function ... whether or not the discretion involved be

abused." *See Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); *see also Berkovitz v. United States*, —— U.S. ——, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988).

in our view the complaint contains quite a sufficient allegation of a governmental invasion of Ms. Payne's property since we must assume as true the allegation that the increased erosion of appellant's land was due to the government's construction activities.[4] We recognize, however, that a sufficient allegation of government invasion of appellant's property alone is not enough to support the conclusion that a compensable taking may have occurred under the facts as alleged in Payne's complaint. The critical issue to be resolved here is whether the circumstances set forth in the complaint could possibly constitute a compensable taking when viewed, as it must be, in light of the government's dominant navigational servitude and the related Supreme Court caselaw binding on this court.

### C. *The Navigational Servitude*

The nation's navigable waters have always been considered "public property" and since the early days of the nation have been under the exclusive control of the federal government under the Commerce Clause. *Gilman v. Philadelphia,* 70 U.S. (3 Wall.) 713, 724–25, 18 L.Ed. 96 (1866); *Gibbons v. Ogden,* 22 U.S. (9 Wheat) 1, 6 L.Ed 23 (1824). The general scope of the government's navigational servitude has been explained by the Supreme Court as follows:

> This power to regulate navigation confers upon the United States a "dominant servitude," *FPC v. Niagara Mohawk Power Corp.,* 347 U.S. 239, 249 [74 S.Ct. 487, 493, 98 L.Ed. 666] (1954), which extends to the entire stream and the stream bed below ordinary high-water mark. The proper exercise of this power is not an invasion of any private property rights in the stream or the lands underly-

ing it, for the damage sustained does not result from taking property from riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of a power to which the interests of riparian owners have always been subject. *United States v. Chicago, M., St. P. & P.R. Co.,* 312 U.S. 592, 596–597 [61 S.Ct. 772, 775, 85 L.Ed. 1064] (1941); (other citation omitted).

*United States v. Rands,* 389 U.S. 121, 123, 88 S.Ct. 265, 267, 19 L.Ed.2d 329 (1967); *see also United States v. Cherokee Nation,* 480 U.S. 700, 107 S.Ct. 1487, 1490, 94 L.Ed.2d 704 (1987).

■ Thus, the government's navigational servitude is a dominant servitude which reflects the superior interest of the United States in navigation and the nation's navigable waters. *United States v. Twin City Power Co.,* 350 U.S. 222, 224, 76 S.Ct. 259, 261, 100 L.Ed. 240 (1956). In *United States v. Chicago, Milwaukee, St. Paul & Pacific R.R.,* 312 U.S. 592, 596–597, 61 S.Ct. 772, 775, 85 L.Ed. 1064 (1941) (hereinafter *Chicago, Milwaukee*), the Supreme Court stressed that "the determination of the necessity for a given improvement of navigable capacity, and the character and extent of it, is for Congress alone.... [T]he rights of the title holder are subordinate to the dominant power of the federal Government in respect of navigation." (Footnotes omitted.) Thus, upon the determination of Congress to improve navigation, the navigational servitude defines the appropriate boundaries within which the United States can assert its power to supersede private ownership interests without creating an obligation to pay just compensation under the Eminent Domain Clause of the Fifth Amendment.

---

**4.** In *Payne v. United States,* 730 F.2d 1434, 1435 (11th Cir.1984), "[t]he Government conceded for the purposes of [its] summary judgment motion that the damage would not have occurred but for the widening of the [upstream river] bend." In its briefs filed in the appeal before this court, the government acknowledges that prior concession and also agrees that, for the purpose of this appeal seeking review of a judgment on the pleadings, the construction by the Corps must be considered to have altered the velocity of the river adjacent to the Payne property. Thus, we have difficulty understanding why the government goes to such great lengths to argue in this appeal that the erosion damage to the Payne property was only an indirect consequence of the Corps' construction activities when, in light of its own concessions and the standard of review in this case, we are compelled to begin our review with the assumption that the damage was a direct and natural consequence of the Corps' construction activities.

### D. The Scope of the Navigational Servitude

The holdings of the Supreme Court and the other federal courts make clear that no compensation is owed by the government for injury or destruction of a riparian owner's property which is located in the bed of a navigable stream. For example, in the *Chicago, Milwaukee* case, the Supreme Court rejected the respondent railroad's claims seeking compensation for damage to its railway embankments located between the high- and low-water marks of the Mississippi River which was caused by raising the river's water level to improve navigation. 312 U.S. at 598, 61 S.Ct. at 776; *see also Greenleaf Johnson Lumber Co. v. Garrison*, 237 U.S. 251, 35 S.Ct. 551, 59 L.Ed. 939 (1915) (no compensation for removal of private wharf located in navigable waters); *Lewis Blue Point Oyster Cultivation Co. v. Briggs*, 229 U.S. 82, 33 S.Ct. 679, 57 L.Ed. 1083 (1913) (no compensation for loss of use of a navigable channel bed for oyster cultivation); *West Chicago Street R.R. v. Illinois*, 201 U.S. 506, 26 S.Ct. 518, 50 L.Ed. 845 (1906) (no compensation for removal of tunnel passing under navigable stream); *Chicago, Burlington & Quincy Ry. v. Illinois*, 200 U.S. 561, 26 S.Ct. 341, 50 L.Ed. 596 (1906) (no compensation for removal and replacement of private bridge across navigable river). Land or property within the bed are always subject to (or burdened with) the potential exercise of the navigational servitude; thus, no compensation is owed when the government takes such land or property as the result of aiding the navigability of the stream.[5] *See Tri–State Materials Corp. v. United States*, 550 F.2d 1, 6, 213 Ct.Cl. 1 (1977); *see also Goose Creek Hunting Club, Inc. v. United States*, 518 F.2d 579, 583, 207 Ct.Cl. 323 (1975).

### 1. The "Bed" of the Navigable Stream

Consequently, the question to be addressed here is what constitutes the boundaries of the "bed" of a navigable stream, determination of which will also define the scope of the navigational servitude applicable to the facts alleged by Payne. In the *Chicago, Milwaukee* case, the Supreme Court defined the bed of a river as—

> "that portion of its soil which is alternately covered and left bare, as there may be an increase or diminution in the supply of water, and which is adequate to contain it at its average and mean stage during the entire year, without reference to the extraordinary freshets of the winter or spring, or the extreme droughts of the summer or autumn."

312 U.S. at 596, 61 S.Ct. at 775 (quoting *Alabama v. Georgia*, 64 U.S. (23 How.) 505, 515, 16 L.Ed. 556 (1860)).[6] Thus, at least with respect to the vertical limits of the navigational servitude, the Supreme Court has left no doubt that the "[h]igh-water mark bounds the bed of the river. Lands above it are fast lands and to flood them is a taking for which compensation must be paid." *United States v. Willow River Power Co.*, 324 U.S. 499, 509, 65 S.Ct. 761, 767, 89 L.Ed. 1101 (1945); *see Kaiser Aetna v. United States*, 444 U.S. 164, 177, 100 S.Ct. 383, 391, 62 L.Ed.2d 332 (1979) (and cases cited) ("none of these cases ever doubted that when the Government wished to acquire fast lands, it was required by the Eminent Domain Clause of the Fifth Amendment to condemn and pay fair value for that interest").

However, it is also well established that the fair value which is to be paid by the

---

**5.** Similarly, the government's navigational servitude can also serve to restrict certain uses of riparian land within the bed of a navigable stream that could affect navigation. *See, e.g., Lambert Gravel Co. v. J.A. Jones Constr. Co.*, 835 F.2d 1105 (5th Cir.1988) (government could assert navigational servitude to prevent contractor from using sand bar located below the high-water mark of river as borrow material); *United States v. DeFelice*, 641 F.2d 1169 (5th Cir.1981) (riparian landowner required to obtain permit from Corps of Engineers before replacing dam across canal subject to the government's navigational servitude).

**6.** *See also Leslie Salt Co. v. Froehlke*, 578 F.2d 742, 752–53 (9th Cir.1978) (finding navigational servitude reaches to the shoreward limit of navigable waters which, in tidal areas, is all places covered by the ebb and flow of the tide to the mean high-water mark in its unobstructed, natural state).

government for the taking of fast land does not include any value derived from access to or use of the stream or its flow. *See Kaiser Aetna*, 444 U.S. at 177, 100 S.Ct. at 391 ("when the Government acquires fast lands to improve navigation, it is not required under the Eminent Domain Clause to compensate landowners for certain elements of damage attributable to riparian location"). The underlying rationale for denying compensation for such claims is reflected in the Court's statement in *United States v. Chandler–Dunbar Water Power Co.*, 229 U.S. 53, 69, 33 S.Ct. 667, 674, 57 L.Ed. 1063 (1913), that "[o]wnership of a private stream wholly upon the lands of an individual is conceivable; but that the running water in a great navigable stream is capable of private ownership is inconceivable." "The Government ... cannot be required to pay any hypothetical additional value to a riparian owner who had no right to appropriate the current to his own commercial use." *Id.* at 76, 33 S.Ct. at 677; *see also United States v. Virginia Elec. & Power Co.*, 365 U.S. 624, 629, 81 S.Ct. 784, 788, 5 L.Ed.2d 838 (1961).[7]

In the present case, there is no allegation of any loss of property or value associated with "the flow of the stream." Nor was the "property" allegedly taken by the government from Ms. Payne an artificial structure built in or under the bed of the Tombigbee River. Instead, the allegedly taken property was the native soil and rock which, although below the high-water mark, supported the fast land and house located beyond the high-water mark. Yet it should not be the extent of the analysis to conclude that the land or property in question was or was not located below the ordinary high-water mark. There must also be horizontal limits to the "bed" of a river; otherwise, the navigational servitude

would extend infinitely in all directions and swallow up any claim for "just compensation" under the Fifth Amendment for damages occurring anywhere below the elevation of the high-water mark. *Cf. Kaiser Aetna*, 444 U.S. at 177, 100 S.Ct. at 391.

### 2. *The Supreme Court Caselaw*

Although not providing an express definition of horizontal limits of the "bed" of a navigable stream as it applies specifically to the navigational servitude, Supreme Court precedent properly limits the range of the navigational servitude to the land beneath and within the navigable stream's high-water mark. In recognizing that there are limits to the horizontal scope of the servitude, the Court has stated:

> Since the privilege or servitude only encompasses the exercise of this federal power with respect to the stream itself and *the lands beneath and within its high-water mark*, the Government must compensate for any taking of fast lands which results from the exercise of the power. This was the rationale of *United States v. Kansas City [Life] Ins. Co.*, 339 U.S. 799 [70 S.Ct. 885, 94 L.Ed. 1277] [1950], where the Court held that when a navigable stream was raised by the Government to its ordinary high-water mark and maintained continuously at that level in the interest of navigation, the Government was liable "for the effects of that change [in the water level] upon private property *beyond the bed of the stream*." 339 U.S. at 800–801, 70 S.Ct. at 886.

*United States v. Virginia Electric & Power Co.*, 365 U.S. 624, 628, 81 S.Ct. 784, 788, 5 L.Ed.2d 838 (1961) (emphasis added).

The case cited above, *United States v. Kansas City Life Insurance Co.*, 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277 (1950), thus

---

7. Examples of elements of damage which are not compensated include the land's value as a hydroelectric site, *United States v. Twin City Power Co.*, 350 U.S. 222, 226, 76 S.Ct. 259, 261, 100 L.Ed. 240 (1956), the land's value as a port site, *Rands*, 389 U.S. at 122, 88 S.Ct. at 266, the loss of gravity flow resulting from elevation differential, *Borough of Ford City v. United States*, 345 F.2d 645 (3d Cir.1965); and the loss of access to navigable water due to such govern-

ment activities as alteration of the stream's channel, *Gibson v. United States*, 166 U.S. 269, 17 S.Ct. 578, 41 L.Ed. 996 (1897), construction in the river, *Scranton v. Wheeler*, 179 U.S. 141, 21 S.Ct. 48, 45 L.Ed. 126 (1900), blocking the flow of the stream, *Transportation Co. v. Chicago*, 99 U.S. (9 Otto) 635, 25 L.Ed. 336 (1878), or even ending the stream's navigability, *United States v. Commodore Park, Inc.*, 324 U.S. 386, 65 S.Ct. 803, 89 L.Ed. 1017 (1945).

provides a clear application of the Supreme Court's view of the horizontal and vertical limits on the scope of a stream bed, and of the corresponding scope of the navigational servitude. The Court in *Kansas City Life* allowed recovery for damage to land located on a non-navigable tributary of the Mississippi River resulting from the artificial maintenance of the Mississippi at its high-water level. The raised water level in the river also raised the local water table which blocked the drainage of the affected parcel's surface and subsurface waters, thereby causing the destruction of the land's agricultural value. The Court viewed the subsurface water flow to result in a "subsurface invasion" of the respondent's land no less destructive than a surface flooding. Since the land, not in the bed of a navigable stream, was not burdened with the navigational servitude, the Court held that a taking had occurred. 339 U.S. at 802–03, 810, 70 S.Ct. at 887, 891. Similarly, the Payne property alleged as lost due to government-caused erosion in this case was outside the bed of the Tombigbee River and therefore unaffected by the navigational servitude.

The government nevertheless argues that the result here should be controlled by the Supreme Court's decision in *Bedford v. United States*, 192 U.S. 217, 24 S.Ct. 238, 48 L.Ed. 414 (1904), in which the Court rejected a claim by landowners along the Mississippi River for compensation for erosion and flooding damages. In *Bedford*, the Mississippi River had, through natural causes, begun to reroute itself in a manner which threatened to cut off the channel of the river which passed by the town of Vicksburg. The government, in an effort to preserve navigable water in the Vicksburg channel, constructed revetments near the cutoff point to prevent further erosion there. The appellants' land was located 6 miles downstream from the cutoff point near where the new cutoff channel rejoined the original river channel. Because the new channel joined the main channel at a sharp angle, erosion at that point was greatly increased. The government's upstream revetment fixed the location and direction of the cutoff channel and the increased erosion at the downstream intersection ultimately washed away or flooded 2,300 acres of appellants' land.

The Supreme Court affirmed a judgment in favor of the government on the grounds that the government's revetment was constructed along the banks of the river in order to preserve the natural course of the river, and was therefore distinguishable from construction in the river bed which obstructed or altered the natural flow. 192 U.S. at 225, 24 S.Ct. at 240. The appellants had also contended that if erosion had not been halted at the cutoff point, the angle at which the cutoff channel would have joined the main channel would have gradually lessened, reducing the amount of damage to their property. The Supreme Court found any increased injury due to the revetments to be conjectural and only an "incidental consequence of [the government's works]." *Id.* Thus, the present facts as alleged are distinguishable from those in *Bedford* since the damages to the Payne property must be assumed here to be the direct consequence of governmental construction which altered rather than preserved the flow course of the Tombigbee River.[8]

■ Strong precedent supports our conclusion that the actual construction equipment or work need not directly en-

---

**8.** The government also cites *Jackson v. United States*, 230 U.S. 1, 33 S.Ct. 1011, 57 L.Ed. 1363 (1913), where the claimant unsuccessfully sought damages for flooding resulting from the government's construction of new levees along the Mississippi River which placed the claimant's plantation between the new levees and the private levees which had previously protected the land from the river's ordinary high water. However, in the absence of the protection provided by the private levees, the claimant's land was below the river's ordinary high-water mark.

*See id.* at 20, 33 S.Ct. at 1018; *see also Hughes v. United States*, 230 U.S. 24, 33 S.Ct. 1019, 57 L.Ed. 1374 (1913). The plantation and private levees in *Jackson* were nothing more than property located or structures constructed in the bed of a navigable river below the ordinary high-water mark, for which no compensation is owed by the government to riparian owners for damages resulting from the improvement of navigation. *Cf. Chicago, Milwaukee*, 312 U.S. at 596–97, 61 S.Ct. at 775.

croach upon the property in question before a taking by the government can be deemed to have occurred. *See also United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). We also reject the offered view that no compensation can ever be owed for the consequential effects of construction activities to further navigation undertaken solely within the boundaries of a river bed subject to the navigational servitude. In fact, the latter argument completely misses the mark. In *Tri-State Materials Corp. v. United States,* 550 F.2d 1, 213 Ct.Cl. 1 (1977), this court's predecessor held that the government could not avoid liability on the basis of the navigational servitude where a dam built to enhance navigability on a river caused plaintiff's sand and gravel mine, which was located outside the bed of a navigable stream, to flood as the result of restricted subterranean drainage. As observed by the Court of Claims, it is not the location of the *cause* of the damage that is relevant, but the location and permanence of the *effect* of the government action causing the damage that is the proper focus of the taking analysis. *Id.* at 4; *see also United States v. Cress,* 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 (1917); *Goose Creek Hunting Club, Inc. v. United States,* 518 F.2d 579, 583, 207 Ct.Cl. 323 (1975).

The government also argues that Payne had no property interest in the uninterrupted natural flow of the Tombigbee River as against the government's authority to improve navigation under its dominant servitude. However, that the instrument of the taking is the increased "flow of the stream" does not place the case within the purview of the *Twin City Power* line of cases. Those cases deal with the value of the property claimed to have been taken, not the manner in which it was taken. *Tri-State,* 550 F.2d at 7–8. We think that the permanent washing away of fast land and a house as the result of government construction causing an increased river velocity is well within the scope of the *Tri-State* holding, which makes clear that it is "the permanence of the *consequences* of the Government act [that] is controlling, and there is no additional requirement that

the *instrumentality* of the consequence be purely a governmental one." *Id.* at 4 (emphasis in original) (citing *Wilfong v. United States,* 480 F.2d 1326, 1329, 202 Ct.Cl. 616 (1973)).

■ Therefore, based on the above analysis, we conclude that Supreme Court precedent undeniably requires our holding that the navigational servitude does not provide a blanket exception to the Takings Clause of the Fifth Amendment where improvements to navigation made by the government result in erosion to land located above *or* outside the bed of the stream as delineated by the high-water mark at the time of the construction. Actually, our research and analysis also reveal that nearly all of our own precedents are in accord with those of the Supreme Court. Unfortunately, allowing the navigational servitude to extend to land beyond the high-water mark outside the bed of the navigable water is the specific issue that was decided incorrectly by the Court of Claims in *Pitman* and by this court in *Ballam.* Not surprisingly, these are the two decisions which the Claims Court felt bound to follow in the present case, unavoidably leading to an incorrect result.

### E. The Error in Pitman and Ballam

#### 1. Pitman v. United States

*Pitman* was an inverse condemnation suit involving beachfront property on the east coast of Florida, seeking compensation for 4 acres of eroded property following interruption of the southerly littoral drift by government construction of channel jetties north of the property. The Court of Claims denied recovery, stating that "while a riparian owner has a right to have navigable waters come to him unchanged in their natural condition as against other riparian owners, he has no such right against the paramount power of the United States to improve navigation." 457 F.2d at 977 (citing *W.A. Ross Constr. Co. v. Yearsley,* 103 F.2d 589 (8th Cir.1939), *aff'd,* 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940), and *Franklin v. United States,* 101 F.2d 459 (6th Cir.), *aff'd,* 308 U.S. 516, 60 S.Ct. 170,

84 L.Ed. 439 (1939)). However, examination reveals that the Supreme Court's affirmances of the judgments in *Ross* and *Franklin* were on entirely different grounds than those described in the two Court of Appeals opinions relied on by the Court of Claims in *Pitman*. [9] Further examination of the now-questioned Court of Appeals opinions in *Ross* and *Franklin* indicates that the earlier Supreme Court opinions relied on in those cases for the broad proposition subsequently adopted in *Pitman* and at issue here do not support the extension made by those courts. Each is distinguishable from the present alleged facts of government-caused erosion outside the natural stream bed.

Finally, under the facts of *Pitman*, most of the land lost was shorefront that existed solely because of the ocean's littoral drift. However, the sand comprising that shorefront property is in a constant state of flux, as existing sand is moved southward by the littoral drift's currents and new sand from the north is deposited in its place. The loss of such shorefront was due to the blocking of the northern "replacement" sand, causing the drift to remove more sand than it replaced. Since the sand comprising the lost shorefront was continually being deposited and moved by the ocean's action, it necessarily lay below the ocean's high-water mark and within the bed of the ocean. As such, its loss would not entitle the riparian owner to compensation under any of the relevant caselaw.[10] Although the Court of Claims in *Pitman* was not incorrect in relying on the Supreme Court's decision in *United States v. Twin City Power*

*Co.*, 350 U.S. 222, 225–26, 76 S.Ct. 259, 261, 100 L.Ed. 240 (1956), to reject recovery since the shoreland sand was present solely due to the uninterrupted "flow" of the ocean, 457 F.2d at 978, the court improperly extended that same logic to prevent compensation for erosion loss of land located above the ocean's high-water mark.

### 2. *Ballam v. United States*

In addition to its reliance on *Pitman*, the Claims Court concluded that this court's decision in *Ballam v. United States*, 806 F.2d 1017 (Fed.Cir.1986), *cert. denied,* ── U.S. ──, 107 S.Ct. 1889, 95 L.Ed.2d 496 (1987), required the dismissal of the Payne complaint on the pleadings. In *Ballam*, the government was granted an easement across Mrs. Ballam's land in which to construct and maintain an artificial canal which was to become part of the navigable waters of the Atlantic Intracoastal Waterway. Following construction of the canal, it was discovered that the wave wash from passing boats on the canal caused significant erosion to Mrs. Ballam's land, and ultimately eroded fast lands outside the bounds of the easement. In the district court, Mrs. Ballam was awarded damages for the taking of the land outside the easement lost to the erosion and for the cost of protecting the bank from further erosion. This court reversed.

If this court in *Ballam* had adopted the view of the Fourth Circuit majority in *Ballam v. United States*, 747 F.2d 915 (4th Cir.1984), *vacated for lack of jurisdiction*, 474 U.S. 1078, 106 S.Ct. 844, 88 L.Ed.2d 886

---

**9.** *Ross* involved a suit against a government contractor who had constructed dikes in the Missouri River for the purpose of improving navigation which resulted in erosion of the plaintiff's accretion land through deflection of the river's current against it. The Eighth Circuit reversed a judgment for the plaintiffs on the grounds that the damage to the riparian land was merely consequential damage and not a taking under the Fifth Amendment. 103 F.2d at 592. The Supreme Court affirmed the judgment solely on the ground that no liability could rest against a contractor "lawfully acting on [the Government's] behalf" and did not address whether the erosion complained of could constitute a taking. 309 U.S. at 22–23, 60 S.Ct. at 415. *Franklin* involved a suit against the government

arising from the construction of similar dikes in the Mississippi River which resulted in the erosion and washing away of plaintiff's land on the opposite side of the river. A divided panel of the Sixth Circuit affirmed a demurrer to the complaint and the Supreme Court summarily affirmed the judgment, but solely on the grounds that the district court had no jurisdiction to entertain the suit. 308 U.S. at 516, 60 S.Ct. at 170.

**10.** Since at least the *Ross* case involved erosion of accretion land in ֊the Mississippi River, the same reasoning would likely have applied there as well. *See* 103 F.2d at 590.

(1986),[11] that there was no showing that the United States directly and proximately caused the erosion damage, then the case could be distinguished on that basis. *Cf. Sanguinetti v. United States,* 264 U.S. 146, 149–50, 44 S.Ct. 264, 265, 68 L.Ed. 608 (1924); *Bartz v. United States,* 633 F.2d 571, 577–78, 224 Ct.Cl. 583 (1980), *cert. denied,* 450 U.S. 967, 101 S.Ct. 1484, 67 L.Ed.2d 616 (1981); *Yazel v. United States,* 93 F.Supp. 1000, 118 Ct.Cl. 59 (1950). Since here we must presume that the erosion to Ms. Payne's property was caused by the government, no further discussion of *Ballam* would be necessary. Unfortunately, this court in *Ballam* chose instead to rely on *Pitman:*

> It hardly is pretended that the government would be responsible to landowners on natural navigable water for *erosion caused by public works* which do not themselves impinge on such upland but only cause water to do so by waves or currents causing erosion. The appellee, and the court below, cite no such cases. There is one the other way, a binding precedent in this court … *Pitman v. United States,* 457 F.2d 975, 198 Ct.Cl. 82 (1972).

806 F.2d at 1021 (emphasis added).

However, the district court in *Ballam* had indeed cited and relied on *United States v. Dickinson,* 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947). *See Ballam v. United States,* 552 F.Supp. 390, 392 (D.S.C. 1982). In *Dickinson,* the government had dammed a river and raised the water level until it flooded Dickinson's land, without condemning the land beforehand. Dickinson and other neighboring landowners brought suit for compensation for the taking of their land, based on the flooding and accompanying erosion. The district court awarded damages for the land permanently flooded, for a flowage easement over other land intermittently flooded, and for the cost of constructing protection on the land above the easement found to be damaged from erosion as a direct and proximate cause of taking of the land permanently flooded. The Fourth Circuit affirmed. 152 F.2d 865 (4th Cir.1946).

Before the Supreme Court, *inter alia,* the government in *Dickinson* challenged the award of damages based on the erosion to land outside the easement. In affirming the judgment, the Court made the following observations:

> [The Government] regards [the erosion damage] as consequential, to be borne without any right to compensation. Of course, payment need only be made for what is taken, but for all that the Government takes it must pay. When it takes property by flooding, it takes the land which it permanently floods as well as that which inevitably washes away as a result of that flooding. The mere fact that all the United States needs and physically appropriates is the land up to the new level of the river, does not determine what in nature it has taken. If the Government cannot take the acreage it wants without also washing away more, that more becomes part of the taking.

331 U.S. at 750, 67 S.Ct. at 1385–86 (citation omitted). Finally, with respect to the measure of damages for the erosion, the Court stated "[i]f the resulting erosion which, as a practical matter, constituted part of the taking was in fact preventable by prudent measures, the cost of that prevention is a proper basis for determining the damage." *Id.* at 751, 67 S.Ct. at 1386.

Regrettably, the relevance of *Dickinson* to the situation in *Ballam* went unrecognized by this court. Perhaps seduced by the unrestrained application of the navigational servitude without horizontal bounds in *Pitman,* this court in *Ballam* determined that "[t]he government does not claim a right to erode Mrs. Ballam's land." 806 F.2d at 1021. However, the practical effect of our decision was to grant to the government the very "right to erode" which it allegedly did not claim, and left Mrs. Ballam's property rights in her land

---

**11.** The government had originally appealed the case, brought under the "Little Tucker Act," 28 U.S.C. § 1346(a)(2), to the Fourth Circuit which issued a decision on the merits. The Supreme Court vacated the decision since the Federal Courts Improvement Act provided that "Little Tucker Act" appeals properly resided in the Federal Circuit. 806 F.2d at 1020.

outside the easement unenforceable. The court further concluded that "[t]he geographical scope of the easement is irrelevant [for if] Mrs. Ballam has the property right she claims at all, it would seem it would be equally valid for land within the easement area, but not yet used for canal enlargement or spoil; she could have that covered by revetment at government expense also." *Id.* at 1022.

However, the geographical scope of the easement was of critical relevance and should have been the determinative issue in *Ballam.* Only one revetment would have been needed to prevent bank erosion and the issue was who should pay for its placement, not where or when the revetment should be placed. In light of the easement granted, the government would have been free to allow the wave erosion to extend to the limits of the easement in hopes that the widening channel would cause the eroding energy of the waves to dissipate before reaching shore. However, once the erosion resulting directly from the government's construction of the artificial waterway reached the land outside the easement right-of-way, *Dickinson* instructs that the cost of revetments necessary to protect land outside the easement be borne by the government. It should make no difference to the analysis or the result that the government-caused erosion in *Dickinson* extended beyond the vertical limits of the easement granted and that the erosion in *Ballam* extended beyond the horizontal limits of the easement.[12]

■ As a final point, the government points to the existence of a flowage easement in the present case, which the government acquired from Ms. Payne's predecessor-in-interest, and argues that the ease-

ment bars any further liability to the government for damage resulting from the construction-related flooding of the Payne property since the property remains subject to the easement. However, the government acquired the right to flood and submerge the land below elevation 76 mean sea level permanently and the additional right to overflow, flood, and submerge the tracts of land above elevation 76 occasionally. The government admits that the Payne house was built above and beyond mean sea level 76. Since the government only acquired a right to flood the land above elevation 76 occasionally, the easement by its terms does not contemplate a complete and permanent flooding of the land above elevation 76 as alleged to have occurred here. So, similar to the situation in *Dickinson,* while the flowage easement would limit any final calculation of damages to the difference between the complete loss of the land due to permanent flooding and the previously compensated loss associated with occasional flooding, it cannot be used to bar recovery of damages altogether.

### F. *Summary*

Thus, in addition to finding *Dickinson* indistinguishable in substance from *Pitman, Ballam,* and the basic facts alleged in the present complaint, we fail to discern valid distinctions between the undermining and permanent loss of fast land (and a house) due to government-caused erosion and the permanent flooding of fast land due to government improvements to navigation found to be compensable by the Supreme Court. *See, e.g., United States v. Grizzard,* 219 U.S. 180, 31 S.Ct. 162, 55 L.Ed. 165 (1911) (compensation allowed for land taken and for loss of easement due to

---

12. Since the canal at issue in *Ballam* was an artificial cut, the bounds of the easement granted to the government should properly define the boundary relevant to a taking analysis related to the initial canal construction. No navigational servitude existed prior to the cut and, after the cut created navigable water, the high-water mark which would have defined the limits of the servitude in *Ballam* was within the easement boundaries. *Cf. Ballam v. United States,* 552 F.Supp. 390, 392 (D.S.C.1982) (where the district court in *Ballam* correctly observed that "even if

navigable servitude is involved, the plaintiff could still recover because of the erosion to her fast lands, which are well above high tide"). In fact, under the contrary view, reliance on the navigational servitude should have resulted in compensation for erosion of the unused portion of the easement. In any event, the common error in both *Pitman* and *Ballam* was the failure to recognize the existence of horizontal limits to both easements and navigational servitudes, beyond which government-caused erosion results in a taking under the Fifth Amendment.

flooding); *Pumpelly v. Green Bay Co.*, 80 U.S. (13 Wall.) 166, 20 L.Ed. 557 (1872) (compensation for land permanently flooded). Certainly Ms. Payne's undercut land and washed-away house are no less useless than would be intact but permanently flooded land which was found to have been the subject of a Fifth Amendment taking in those cases. Since the Supreme Court in *Kansas City Life* expressly concluded that there was a taking when government improvements to navigation caused underground seepage into land below the high-water mark but outside the stream bed, thus rendering the land useless, it is difficult to understand how erosion, itself a much more violent invasion than seepage, of land below the high-water mark yet outside the stream bed can never constitute a compensable taking. Since the decisions in *Pitman* and *Ballam* make such distinctions and require such conclusions, we hereby overrule those decisions to the extent that they allow the navigational servitude to reach fast land above and outside the bed of navigable water.[13]

As the Supreme Court observed in *Kaiser Aetna*, decided after *Pitman*, "this Court has never held that the navigational servitude creates a blanket exception to the Takings Clause whenever Congress exercises its Commerce Clause authority to promote navigation." 444 U.S. at 172, 100 S.Ct. at 389. Although the Court has held that compensation may not be required as a result of the federal navigational servitude for alleged takings involving the public right of navigation, *id.* at 175, 100 S.Ct. at 390, it is clear that whether the government action went so far as to amount to a "taking" is a separate and distinct inquiry from the existence of the navigational servitude itself, *id.* at 174, 100 S.Ct. at 390. The Court itself recognizes its inability to " 'develop any "set formula" for determining when "justice and fairness" require

that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons.' " *Id.* at 175, 100 S.Ct. at 390 (quoting *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)); *Pete v. United States*, 531 F.2d 1018, 1034, 209 Ct.Cl. 270 (1976) (whether a taking has occurred depends on the particular circumstances presented). Such "taking" inquiries are often decided on the basis of narrow, factual distinctions, *Kaiser Aetna*, 444 U.S. at 175, 100 S.Ct. at 390, and erosion issues are inherently factual. *Loesch v. United States*, 645 F.2d 905, 913, 227 Ct.Cl. 34, *cert. denied*, 454 U.S. 1099, 102 S.Ct. 672, 7 L.Ed.2d 640 (1981). As factual issues, they are rarely proper for resolution on the pleadings.

### G. *One Final Issue*

■ The parties focused their arguments in this appeal on the issue that was the linchpin of the Claims Court decision: whether the government's navigational servitude was of sufficient scope to cover the alleged taking of Payne's property under the alleged facts. However, since a remand will necessarily be required in light of our conclusions above, we feel it proper to address one other issue raised in this appeal that may continue to be an issue on remand. Appellant asserts in his brief that the navigation servitude cannot apply in this case because that portion of the Tombigbee River at issue here was not navigable until *after* the Corps had dredged, rechanneled, and made artificial cuts to construct the waterway.[14]

The government's assertion that there is nothing in the record to support the claim that the river was not navigable prior to construction is of dubious value since we are reviewing a judgment on the pleadings and the particular facts which would form

---

**13.** Similar statements in other Court of Claims cases, although not always necessary to their respective decisions, to the effect that the waters which effect the taking must rise above the ordinary high-water mark of the river involved as a result of improvements to navigation should also be viewed as inaccurate. *See, e.g.,*

*Barnes v. United States*, 538 F.2d 865, 870–71, 210 Ct.Cl. 467 (1976).

**14.** The parties do not dispute that the portion of the Tombigbee River adjacent to the Payne property is navigable in its present, postconstruction state.

the record on that issue have yet to be adduced. The Eleventh Circuit's decision focused solely on whether the government's decision not to conduct preconstruction studies was discretionary and any statements regarding the navigability of the Tombigbee River prior to the construction were not actually litigated nor necessary to the decision in that case. *See Mother's Restaurant Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1569–70, 221 USPQ 394, 397 (Fed.Cir.1983). Thus, such statements cannot serve under the principles of issue preclusion to bind the present parties with respect to the specific river segment at issue here.

It is undisputed that the Tennessee–Tombigbee Waterway Project was authorized by Congress in 1946 as an improvement for navigation purposes. *See Payne*, 730 F.2d at 1435, 1437. However, it does not appear altogether incongruous that the creation of navigable water where there was none before could be deemed "an improvement to navigation." Nevertheless, relying on *Ex parte Boyer*, 109 U.S. 629, 3 S.Ct. 434, 27 L.Ed. 1056 (1884), and *Ballam*, the government asserts that its navigational servitude would still dominate Payne's private property interests even if it is assumed that the river was nonnavigable prior to the Corps' construction. Yet, as the Supreme Court cautioned in *Kaiser Aetna*, 444 U.S. at 170–71, 100 S.Ct. at 388, it is important to appraise the purpose for which the concept of "navigability" was invoked in a particular case before attempting to delimit the bounds of the navigational servitude.

In *Boyer*, the Supreme Court held that a navigable, artificial canal used in interstate commerce was public water of the United States and within the legitimate scope of admiralty jurisdiction of the federal courts. There was no question that navigability existed at the time of the incident giving rise to the suit in *Boyer* and the fact that the canal was not navigable or did not exist at some time prior to the incident made no difference to whether the federal court had jurisdiction. Here, if navigability did not exist when the events giving rise to the taking commenced, the navigational servitude cannot apply. To allow the naviga-

tional servitude to attach to nonnavigable water or land which is being made navigable would allow the government to build artificial canals for use in interstate commerce without ever paying just compensation for the land in which a canal was built. Thus, a successful demonstration by the appellant that the river was nonnavigable prior to construction would be a valid basis for upholding the appellant's general claim that the government's navigational servitude would not foreclose recovery of compensation for a taking by the government.

Navigability is a question of fact determined from the particular circumstances of each case, *United States v. Utah*, 283 U.S. 64, 87, 51 S.Ct. 438, 445, 75 L.Ed. 844 (1931); however, there are also questions of law inseparable from the particular facts to which they are applied. *Loving v. Alexander*, 745 F.2d 861, 865 (4th Cir.1984) (citing *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 404, 61 S.Ct. 291, 297, 85 L.Ed. 243 (1940)). At this stage of the proceeding, we are unable to reach the conclusion necessarily urged by the government that there are no possible facts which could be proved to support the assertion that the Tombigbee was only made navigable by the Corps' construction. Therefore, whether the Tombigbee River was navigable water prior to the commencement of the construction by the Corps of Engineers should also be considered an open question by the Claims Court on remand.

## CONCLUSION

When the Army Corps of Engineers initiated plans to alter the channel of the Tombigbee River, it realized that the construction would lead to encroachment of some adjoining property. Rather than identify and acquire the specific areas likely to be harmed prior to construction, the Corps decided it would be cheaper to undertake the construction and acquire through inverse condemnation those areas actually suffering damage. Apparently, the Payne property was such an area and suit was brought against the government seeking compensation for the resulting damages. When the Eleventh Circuit affirmed the

dismissal of Payne's tort claims, it noted that an inverse condemnation claim was available in the Claims Court. This is the appeal of that Claims Court action, yet our precedent mandated that there can be no possible legal recovery under any conceivable state of facts for the very damages that have been anticipated and contemplated as potentially compensable since the beginning of the Tennessee–Tombigbee Waterway Project!

Thus, this court was confronted with an anomaly of its own creation. If the only relevant precedent was that of the Supreme Court, it is certain that the Payne complaint would have withstood the government's motion for a judgment on the pleadings. But since that was not all that was binding on the Claims Court, that court understandably concluded that it had no choice but to enter judgment for the defendant as the precedent of this court, specifically *Pitman* and *Ballam,* completely foreclosed any possible recovery on the facts alleged here. Now, in light of the foregoing analysis overruling those decisions to the extent of their complete foreclosure of recovery for government-caused erosion outside the bed of a navigable stream, the anomaly which barred the Payne taking complaint has been eliminat-ed, as it should have been, by this court sitting in banc.

On remand the government will not be constrained to accept the complaint's factual allegations and will be free to prove that the alleged destruction was either not the result of its action or was such an indirect consequence of it as not to be a compensable taking. However, the executor of the Payne estate will now also have the opportunity to prove his allegations that the loss of Ms. Payne's fast land and house was the direct result of the government's improvements to navigation on the Tombigbee River or flowed from "an intention to do an act the natural consequence of which was to take [the] property." *Columbia Basin Orchard v. United States,* 132 F.Supp. 707, 709, 132 Ct.Cl. 445, 450 (1955).

The judgment of the Claims Court is reversed and the case is remanded to the Claims Court for further proceedings not inconsistent with this opinion.

REVERSED and REMANDED.