22 F.3d 1103
NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
 BP CHEMICALS LIMITED, Plaintiff-Appellant,
v.
EASTMAN KODAK COMPANY, Defendant-Appellee.
 Nos. 93-1413, 93-1414.
 United States Court of Appeals, Federal Circuit.
 March 7, 1994.
Suggestion for Rehearing In Banc
Declined March 31, 1994.
 
 Before PLAGER, CLEVENGER, and SCHALL, Circuit Judges.
 CLEVENGER, Circuit Judge.
 
 
 1
 BP Chemicals Limited appeals the June 7, 1993 judgment of the United States District Court for the Eastern District of Tennessee dismissing its complaint with prejudice. In granting Eastman Kodak Company's motion for judgment on the pleadings, or for summary judgment in the alternative, the district court held that a prior settlement agreement between BP and Eastman barred BP's patent infringement action. BP Chems. Ltd. v. Eastman Kodak Co., No. CIV-2-93-19 (E.D.Tenn. May 12, 1993). We affirm.
 
 
 2
 * This case involves a contract executed on November 18, 1988 by BP and Eastman to settle their ongoing legal disputes in the United States and England. BP had filed an action in the U.S. District Court for the District of New Jersey alleging that Eastman's manufacture of acetic anhydride at its Kingsport, Tennessee facility infringed BP's U.S. Patent No. 4,690,912. In England, Eastman had appealed an adverse judgment from the High Court of Justice involving Eastman's claim that BP's construction of an acetic anhydride manufacturing facility in Hull, England threatened to infringe Eastman's British Patent Nos. 1,468,940 and 1,538,783. In the contract, the parties ceased both legal proceedings and agreed not to assert their respective patent rights, obtained from any application filed in any patent office prior to November 1, 1988, against each other with respect to activity at BP's future Hull plant or at Eastman's Kingsport plant. The reciprocal provisions of the contract relevant to this case follow.
 
 Article 1--DEFINITIONS
 
 3
 1.03 [BP's] PLANT shall mean the commercial facility, which [BP] is constructing and intends to operate, at Hull, England, including any expansion thereof, for the production of acetic anhydride, ... via carbonylation.... (emphasis added).
 
 
 4
 1.04 EASTMAN'S PLANT shall mean the commercial facility, which EASTMAN is operating at Kingsport, Tennessee including any expansion thereof, for the production of acetic anhydride via carbonylation.... (emphasis added).
 
 Article 2--COVENANTS NOT TO SUE
 
 5
 2.01 [BP] shall not assert and shall procure that no RELATED COMPANY of [BP] shall assert any of [BP]'s PATENT RIGHTS or those of a RELATED COMPANY of [BP] against the operation of EASTMAN'S PLANT or the use or sale throughout the world of acetic anhydride ... produced in EASTMAN'S PLANT.
 
 
 6
 2.02 EASTMAN shall not assert and shall procure that no RELATED COMPANY of EASTMAN shall assert any of EASTMAN's PATENT RIGHTS or those of a RELATED COMPANY of EASTMAN against the operation of [BP]'s PLANT or the use or sale throughout the world of acetic anhydride ... produced in [BP]'s PLANT.
 
 
 7
 At the time of the contract, Eastman's Kingsport facility consisted of over 391 buildings on 3700 acres, where Eastman manufactures basic fibers, 3 types of plastics, and over 300 industrial chemicals. Eastman's plant for the production of acetic anhydride by carbonylation, however, is merely one of five plants comprising Eastman's 55 acre "chemicals-from-coal complex" at Kingsport. In January 1989, Eastman announced its plans to construct additional structures at its Kingsport facility for the production of acetic anhydride by carbonylation, significantly increasing its plant capacity from 225,000 tons to 300,000 tons per annum. According to an Eastman press release which BP introduced into evidence, these new structures are "closely integrated with the existing facility by using common or debottlenecking equipment and duplicating only equipment trains where necessary." Moreover, the new structures are adjacent to the old facilities.
 
 
 8
 The production of acetic anhydride by carbonylation is the subject matter of BP's U.S. Patent No. 5,003,104 (the '104 patent). The parties do not dispute that, absent other considerations, the contract would pertain, inter alia, to the '104 patent, the application for which BP filed on October 31, 1988. For the purposes of its motions, Eastman admits that the additions to its Kingsport facility constitute "a second and new plant" for the production of acetic anhydride by carbonylation.
 
 II
 
 9
 On September 2, 1992, BP filed a complaint in the U.S. District Court for the District of New Jersey alleging infringement of its '104 patent by Eastman's manufacture at "a second and new plant" in its Kingsport facility of acetic anhydride by carbonylation. On January 7, 1993, the district court granted Eastman's motion to transfer the case to the U.S. District Court for the Eastern District of Tennessee. On January 27, 1993, Eastman filed a motion for judgment on the pleadings, or for summary judgment in the alternative, alleging that the 1988 settlement contract barred BP's patent infringement action. The district court granted BP's request for additional time to prepare its opposition to Eastman's motion and permitted discovery of information regarding Eastman's operation at the Kingsport facility. On reconsideration of its grant of discovery, however, the district court determined that the threshold issue of contract interpretation could be resolved without discovery, and thus directed Eastman to refile its original motion solely as a motion for judgment on the pleadings. On May 12, 1993, the district court held that the contract barred BP's patent infringement action because the ordinary meaning of "expansion" encompassed Eastman's "second and new plant." The district court thus granted Eastman's motion and ordered the dismissal of BP's complaint with prejudice.
 
 III
 
 10
 This court reviews in a plenary fashion a district court's grant of judgment on the pleadings. See Chang v. United States, 859 F.2d 893, 894 (Fed.Cir.1988) (" '[I]n reviewing the grant of a judgment for the defendant on the pleadings,' ... [the] same standard of review applies [as in] a case ... dismissed because the complainant fails to state a claim upon which relief could be granted." (citations omitted)); see also Dehne v. United States, 970 F.2d 890, 892 (Fed.Cir.1992) (reciting plenary standard of review whether the court properly dismissed for failure to state a claim upon which relief can be granted). The interpretation of a contract term is a question of law requiring de novo review. C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1544 (Fed.Cir.1993).
 
 IV
 
 11
 BP contends on appeal that the district court inappropriately granted judgment for Eastman on the pleadings based on the incorrect determination that the 1988 settlement contract barred BP's patent infringement action. Specifically, BP challenges the district court's holding that Eastman's construction of "a second and new plant" for the production of acetic anhydride by carbonylation at its Kingsport facility was within the contract provision which permitted "any expansion" of the facility. BP argues that the district court reached this erroneous conclusion after rejecting unrebutted expert testimony offered by BP as relevant evidence of the specialized meaning that those in the chemical and petroleum manufacturing industry, including the parties, attributed to the term "expansion" when used in the specific context of a licensing agreement like the contract here.
 
 
 12
 A motion for judgment on the pleadings should be granted only where it appears to a certainty that the plaintiff cannot obtain relief based on the facts presented, even if those facts were proven. Owen v. United States, 851 F.2d 1404, 1407 (Fed.Cir.1988). Moreover, the court must accept the plaintiff's well-pled factual allegations as true and draw all reasonable inferences in favor of the plaintiff. Id. Nonetheless, on the facts of this case, we hold that Eastman is entitled to judgment on the pleadings as a matter of law for the following reasons.
 
 V
 
 13
 Eastman argues that the ordinary meaning of "expansion" should attach because the term "expansion" as used in the 1988 settlement contract is unambiguous. Moreover, the contract does nothing to limit or otherwise alter the ordinary meaning of the word. Eastman reasons that under the ordinary meaning of "expansion," the contract contemplates, inter alia, the construction of "a second and new plant" at the Kingsport facility for the production of acetic anhydride by carbonylation. The district court accepted this contention, holding that Eastman's addition of new pipes, tanks, reactors and related equipment, which comprise the new plant, adjacent to its existing plant was clearly within the everyday meaning to industrial engineers and architects of "expansion." BP Chems., slip op. at 4.
 
 
 14
 BP agrees that the term "expansion" as used in the contract is unambiguous. BP, however, argues that the plain meaning relevant to this case is that given to the term "expansion" by those in the chemical and petroleum manufacturing industry in the specific context of licensing agreements. The industry meaning of "expansion" as explained by BP is limited only to particular activities such as optimization, fine tuning, and debottlenecking. BP therefore contends that Eastman's construction of "a second and new plant" is necessarily beyond the industry meaning of "expansion" and that the contract thus does not bar BP's patent infringement action against the manufacture of acetic anhydride by carbonylation in this "second and new plant."
 
 
 15
 Although this case involves a patent infringement action, the relevant issue on appeal involves contract interpretation. In such circumstances, we look to Tennessee law, the state law to which the U.S. Court of Appeals for the Sixth Circuit, the applicable regional circuit, would look. See Sun Studs, Inc. v. Applied Theory Assocs., Inc., 772 F.2d 1557, 1561 (Fed.Cir.1985) (applying Oregon law as the Ninth Circuit's choice of applicable law to the enforceability of a settlement contract involving patent infringement claims). In contract interpretation under Tennessee law, the "ordinary meaning [of a contract term] is that meaning which would have been derived from its words by reasonable persons dealing in the same situation as that of the contracting parties." Moore v. Moore, 603 S.W.2d 736, 739 (Tenn.Ct.App.1980); see also Snelling & Snelling, Inc. v. Parnell, 440 S.W.2d 23, 27 (Tenn.Ct.App.1968) (holding that absent "a clear, mutual understanding of the intended meaning of a word ... the courts must presume that the intended meaning was that which appears reasonable when viewed in the light of the circumstances and context in which the word was used").
 
 
 16
 In this case, however, we need not decide whether the district court erred in disregarding BP's argument that the context of the 1988 settlement contract required adoption of the proffered industry meaning of "expansion." Any such error by the district court is harmless here because the evidence offered by BP shows that the industry meaning of "expansion" is inapplicable when the contract does not address the issue of plant capacity. The affidavits of BP's experts, Mr. James Buchanan and Mr. Robert J. Wagner, each stated clearly that "[w]here parties are comparing plant capacities," the term "expansion" as commonly used in chemical and petroleum license agreements refers to the fine tuning and debottlenecking of a plant so as to increase plant capacity in a limited manner. Moreover, Mr. Kenneth R. Dobson, who negotiated the 1988 settlement contract on behalf of BP, repeatedly refers to "limited increases in plant capacity" in relating his understanding of the term "expansion" as used in the contract. As both BP and Eastman recognized, however, the contract makes no reference whatsoever to plant or production capacity. Indeed, BP admits that "the scope of any permissible 'expansion' must be considered in the context of the 'facility' " according to the contract because the contract refers to existing facilities, including any expansion thereof, and not to comparative plant capacities. Therefore, even accepting BP's evidence as true and drawing all reasonable inferences from such evidence in favor of BP, the industry meaning of "expansion" as explained by BP is irrelevant to the interpretation of the term "expansion" as used in this contract. Absent any evidence that those in the chemical and petroleum manufacturing industry assign a specialized meaning to the term "expansion" when used in a contract solely to describe industrial facilities, we agree with the district court that the ordinary meaning of "expansion" applies here.
 
 
 17
 Furthermore, we agree with the district court that if plant or production capacity indeed had been the critical issue, these "two industry giants" could easily have set forth a limitation in the contract on the capacity of acetic anhydride that the parties could produce at their respective facilities. Not having done so, neither party can now impute a capacity limitation into the 1988 settlement contract. We therefore reject BP's interpretation of the term "expansion" in the contract to mean only activities such as optimization, fine tuning, or debottlenecking, because it necessarily imputes the capacity limitations inherent to such processes into a contract which does not otherwise refer to plant capacity. The district court thus correctly held as a matter of law that construing the term "expansion" as used in this contract requires the application of its ordinary meaning rather than its industry meaning as offered by BP.
 
 VI
 
 18
 Applying the ordinary meanings of "expansion" and "facility" to those terms as used in the 1988 settlement contract, Eastman's construction of "a second and new plant" at its Kingsport facility for the production of acetic anhydride by carbonylation constitutes an "expansion" of its existing "facility." Under its ordinary meaning, a "facility" is defined by the particular function which it performs. Webster's Third New International Dictionary 812-13 (1976) (defining "facility" as "something (as a hospital, machinery, plumbing) that is built, constructed, installed, or established to perform some particular function or to serve or facilitate some particular end"). Therefore, so long as Eastman's "second and new plant" serves the same particular function as the existing plant, the construction of anything additional represents an enlargement of the ability to perform that function, and thus an "expansion" of the "facility." See id. at 798 (defining "expansion" as the "[a]ct or process of expanding, ... ENLARGEMENT). As stated above, this contract limits the term "facility" only geographically as to Kingsport, Tennessee and Hull, England. The contract does not otherwise restrict the ordinary meaning of "facility." We therefore hold that Eastman's construction activity constitutes an "expansion" of its existing "facility" and that the contract thus bars BP's patent infringement suit with regard to Eastman's "second new plant" for the production of acetic anhydride by carbonylation. Thus, judgment for Eastman on the pleadings is required as a matter of law.