MaddeN, Judge,
delivered the opinion of the court:
The plaintiff sues to recover just compensation for the alleged taking of its property by the United States. It is the owner of land situated on the north bank of Bayou Plaque-mine in the State of Louisiana. It asserts that the Government took its property by dredging a ship channel in the bayou so close to the low water mark, the boundary of the plaintiff’s land under the law of Louisiana, that the plaintiff’s soil caved, some of its land became submerged, and the stability of other land became so endangered that the plaintiff was obliged to build an expensive bulkhead to preserve its stability.
In 1888 Congress provided by law for the dredging of a channel through Bayou Plaquemine, to connect the lower Atchaf alaya Biver to the Mississippi Biver. A channel with a bottom width of 95 feet and a depth of 10 feet at low water mark was dredged. In order to provide sloping sides for the channel, a width of about 200 feet was dredged, and the north bank was cut back from 25 to 40 feet beyond the then low water mark. This work was completed in 1911.
The plaintiff acquired its land in several parcels, the last acquisition being in 1919. The land had a frontage of some 245 feet on the north bank of the bayou. Adjacent to the bayou there was a flat area some seven or eight feet above low water mark, and 20 to 30 feet wide. Then there was a steep bank some 18 feet high, and the rest of the plaintiff’s land was *94 on this higher level. The plaintiff’s buildings, a machine shop, storehouse, pattern shop and office were located on the high ground. The ground on the lower level was used in connection with repair work on vessels.
By statutes in 1925 and 192Y Congress provided for improvements in the New Orleans-Sabine River section of the Intracoastal Waterway, and specified a bottom width of 100 feet and a nine-foot depth for the channel in Bayou Plaque-mine. This work was completed by June 30,1934.
From the year 1905 down to date the Government, through the Corps of Engineers, has, in all except five years, dredged the channel in the bayou in front of the plaintiff’s property, but since 1934 the dredging has been for maintenance purposes only. Between the years 1926 and 1934 substantially all of plaintiff’s land on the lower level caved into the bayou, and the water line thus came near to the bottom of the slope leading to the plaintiff’s high ground. In 1934 there was an extensive cave-in of the higher land, the plaintiff losing some six or seven feet of its high level land at its eastern border, and some 18 feet at its western border. The plaintiff, in an effort to prevent further caving, in 1935 drove a row of 40- to 50-foot cypress piles, spaced four feet on centers, just above the low water level. The piling was not effective for the purpose and within seven or eight years the piles broke off and disappeared. In 1939 the plaintiff removed a bay or section of a building which stood close to the edge of the receding bank.
After the extensive cave-in in 1934 the edge of the upper bank continued to disintegrate, and by the year 1951 had receded four or five feet farther at the east end of the plaintiff’s property, and 15 feet at the west end. In 1950 the plaintiff was advised by an engineer that unless protective steps were taken the plaintiff’s buildings were in danger of destruction by the caving of the land on which they stood. In late 1950 and early 1951 the caving of the land had greatly accelerated after the removal of the old highway bridge and its abutments. The plaintiff demanded that the Government construct the necessary protection, and said that if it refused to do so, the plaintiff would do it and hold the Government responsible for its cost. The Government rejected the de *95 mand. The plaintiff then obtained from the Corps of Engineers a permit to erect a sheet steel pile bulkhead across the face of its property at the water’s edge. The bulkhead was constructed at a cost of $45,395.71. The present suit is for this amount, plus the value of the land which had caved in before the bulkhead was constructed.
The plaintiff’s petition was filed on October 1,1954. The Government pleads the statute of limitations, asserting that the wrongs complained of, if any were committed, occurred more than six years before the suit was filed. 28 U. S. C. § 2501.
As we have seen, by 1934 practically all of the lower level of the plaintiff’s land had caved into the water, and the surface of the water thus came close to the edge of the steep slope at the bottom of the high bank. Then the extensive cave-in of the high bank occurred, the ineffective attempt to protect the bank was made, and the caving continued until an adequate bulkhead was installed.
The plaintiff argues that the doctrine of United States v. Dickinson, 331 U. S. 745, permits it to base its cause of action upon acts and events occurring before October 1, 1948, the date six years before its petition was filed. In the Dickinson case the Court held that a landowner whose land would be submerged by the lake created by the construction of a dam by the Government, although it would not be premature for him to bring suit as soon as the dam was completed, could bring suit within six years after the water reached its ultimate level because the statute of limitations did not begin to run until the lake was filled, “until the consequences of inundation have so manifested themselves that a final account may be struck.”
We think the plaintiff would carry the Dickinson doctrine too far. As this Court said in Columbia Basin Orchard v. United States, 116 C. Cls. 348, 357, the Dickinson doctrine does not permit a plaintiff to wait “until any possibility of further damage (has) been removed.” In the instant case when, before 1934, the water had practically reached the bottom of the steep bank sloping up to the upper level land, the ultimate cave-in of that land was a foreseeable future event. In 1934 there was an extensive cave-in, and the caving process *96 was continuous from that time. If the upper level land was to be saved, a bulkhead had to be built. An ineffective one was built in 1985, which showed that the plaintiff was then aware of what would happen to the land in the course of time.
The very same suit, on the same grounds and for the same damages, could have been brought by the plaintiff at least as long ago as 1934. If it had been brought at that time, questions of fact the solution of which is difficult on the present record would or might have been easier to solve. The purpose as well as the period of the statute of limitations argue against the plaintiff.
In the instant case the bayou had encroached upon the plaintiff’s land. It may have done so by reason of erosion from natural causes, or it may have done so because of the Government’s removal of lateral support by the dredging of the channel, although the present record fails to prove this latter possibility. If the latter, and if such removal of lateral support ever was an actionable taking of the plaintiff’s land, it occurred so long ago that any right of recovery is barred by the statute of limitations. Since the additional area of water had now become a part of the navigable stream, the Government’s easement of navigation, and of deepening the channel in aid of navigation would seem to be applicable. Whether the boundary line of the plaintiff’s ownership had shifted with the shift of the water line would seem to be immaterial. The doctrine in some states that the private owner along a stream owns to the thread of the stream does not affect the Government’s easement of navigation.
The parties have not been able to cite any decision on the question whether the Government, in the exercise of its easement of improving navigation by deepening a channel, is liable to an abutting owner for the removal of lateral support from his land. Our conclusion that, if such removal of support occurred in this case, it occurred so long ago that a claim based upon it is barred by the statute of limitations, prevents us from reaching that question.
The plaintiff’s petition will be dismissed.
It is so ordered.
Laramoee, Judge; Whitaker, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
*97 FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, the briefs and arguments of counsel, makes findings of fact as follows:
1. The plaintiff, Nadler Foundry and Machine Company, Inc., whose principal place of business is in the Parish of Iberville, Louisiana, was organized under the laws of the State of Louisiana on December 1, 1925, to carry on a business which had been established by the late Henry Nadler in 1888.
In 1926 the corporation issued all of its capital stock to the widow and heirs of Henry Nadler in exchange for the firm’s assets, which included a machine shop, store house, pattern shop and office, together with machinery and equipment therein, and the real property on which they stood. This real property, which is the basis of plaintiff’s claim in suit, is described generally as being situated on the north bank of the Bayou Plaquemine, opposite the Town of Plaquemine, forming one tract of land bounded on the north by South Street and extending southerly to Bayou Plaque-mine, with a front on the north bank of Bayou Plaquemine of approximately 245 feet. Under the laws of the State of Louisiana, the corporation’s title to this real estate extended down to the ordinary low water line of the Bayou; under Federal law, this title is, of course, subject to a navigation servitude in favor of the United States up to the high-water mark.
2. Bayou Plaquemine lies in the south central part of Louisiana, 112 miles above New Orleans, Louisiana. This outlet of the Mississippi River forms a navigable route between the Mississippi and the Atchafalaya Rivers, extending southwesterly about 11 miles from the lock at Plaque-mine, Louisiana, to Grand River, an arm of the Atchafalaya River.
3. In 1867 the officials (Police Jury) of Iberville Parish extended the Mississippi River levee across the head of the bayou where it joined the river. In 1888, however, Congress enacted a law which provided for the improvement of the water route from the lower Atchafalaya River to the *98 Mississippi River at Plaquemine, Louisiana, by the dredging of a channel from the deep water of the Mississippi River to the Plaquemine dike and the construction of a lock connecting the bayou with the river.
The proposed dimensions provided that this channel would be 60 feet wide and 6 feet deep, but these were later modified to a bottom width of 95 feet and a depth of 10 feet at low water. In order to provide sloping banks for the channel an area much wider than the 95 feet width was dredged in the original project. The distance from the top of the original cut on the north side to the top of the original cut on the south side of the channel was an average of 200 feet. This included the removal of from 25 to 40 feet of land above the then low water line on the north bank.
The entire project was completed in May 1911, but the lock was completed and opened for navigation in 1909.
4. With respect to the operations that are hereinafter discussed, reference is frequently made to the “forebay” and the “tailbay” of the lock. The word “forebay” refers to that part of the bayou which lies between the lock and the Mississippi River. The “tailbay” has reference to that portion of the bayou which extends westerly from the lock to a point approximately 300 or 400 feet beyond the second of two bridges which cross the bayou in the town of Plaque-mine. The course of the bayou westerly from the lock is roughly in the shape of the letter “S” with the bridge crossings approximately at the base of the upper curve. One of the bridges is a railroad bridge and the other is a state-owned highway bridge.
5. Plaintiff’s property, the last piece of which had been purchased near the lock side in 1919, is located on the tailbay on the north side of the bayou several hundred feet westward from the lock. The land adjoining the Nadler property on the west was owned by the State of Louisiana and was used to provide space for the swing of the highway bridge referred to in finding 4.
The major portion of plaintiff’s property, on which its buildings and other facilities are located, is high land, being approximately 25 feet above the average low water line of the bayou. South of this high land is a relatively steep *99 slope or bank extending down to a lower level of flat land or platean having an elevation of approximately 7 or 8 feet above average low water level of the bayou. This plateau originally extended across the full face of the Nadler property a depth of from 20 to 30 feet measured horizontally from the water’s edge to the bottom of the slope leading to the higher level. However, when plaintiff acquired the property in 1926 a portion of this lower shelf had been lost, but there remained 8 to 15 feet, and at that time no part of the upper bank had caved or receded. Most of this 8 to 15 feet of lower level shelf had disappeared before 1934.
6. Plaintiff, and, prior to its incorporation, its predecessors have at all times openly and continuously possessed and used all of the property described in findings 1 and 5, down to the water’s edge of Bayou Plaquemine. The buildings and other facilities are located on the upper level; the lower level or shelf had been used prior to 1934 principally in connection with repair work on vessels.
7. By legislative enactments of March 3,1925, and January 21, 1927 (43 Stat. 1186, 44 Stat. 1010) Congress authorized and directed certain improvements on the Plaquemine-Morgan City alternate route of the Intracoastal Waterway, New Orleans-Sabine River Section, part of which provided for a bottom width of 100 feet with a 9-foot depth at mean low water in Bayou Plaquemine. The Plaquemine-Morgan City project was completed in the fiscal year 1934.
8. The bayou, or tailbay of the Plaquemine lock in the vicinity of plaintiff’s property, is approximately 200 feet wide, within which is the authorized channel 100 feet wide and 9 feet deep, or to a depth of minus 9 feet mean low Gulf of Mexico, with an allowable overdepth of 2 feet.
Beginning in 1905 the Corps of Engineers has conducted dredging operations at the lock, at the approaches, and in the tailbay of the lock in Bayo a Plaquemine practically each year with the exception of the years 1913, 1914, 1927, 1943 and 1946. Except for the widening of the channel from 95 feet to 100 feet in 1934 as shown in finding 7, these dredging operations have been maintenance dredging which is described more fully in finding 23.
*100 9. Between tbe years 1926 and 1934 all, or substantially all, of plaintiff’s property located on the lower shelf or level gradually caved into Bayou Plaquemine, with a consequent recession of the shore line northward, but there was no appreciable caving of the bank at the upper level. On August 8, 1934 however, a cave of extensive proportions occurred in front of the Nadler property and a large segment of the higher land slid or caved downward and outward. By this caving the top of the upper land level of plaintiff’s property receded northward, at the easterly side a distance of 6 or 1 feet, and at the westerly side it receded towards plaintiff’s principal building a distance of approximately 18 feet, which reduced the width of the surface land area at that point at the rear of the buildings from 30 feet to 12 feet.
10. In 1935, as a result of the caving and recession of the bank on the upper level, and in an effort to prevent further caving plaintiff, after obtaining a permit from the United States Corps of Engineers, drove a series of 40 to 50-foot cypress piling, spaced 4 feet center to center, the entire length of its property along the bayou side, above the low water level. This piling did not constitute a true bulkhead, and while retarding the caving it did not hold the bank to any effective degree, and gradually the piling deteriorated and sheared off, disappearing within seven or eight years after construction.
11. In 1939 plaintiff demolished a “bay” or section of the building towards which the top of the bank had receded as noted in finding 9. The section of building thus removed had a depth of 15 feet (measured north to south) and was approximately 30 feet in width.
12. Subsequent to the extensive cave which occurred in 1934, and over a period of years, the top edge of the upper bank continued to disintegrate, slowly and gradually, as small cavings occurred, and by 1951 the upper area of plaintiff’s property had receded, at the easterly end a distance of 4 or 5 feet, and at the westei-ly end a distance of 15 feet, so that, between 1934, prior to the caving of that year, and 1951, the upper bank or area of plaintiff’s property had caved and receded northward a distance of from *101 30 to 35 feet on the westerly side and 10 or 12 feet on the easterly side.
13. In the fall of 1950 the state highway bridge was replaced by a new bridge which had been constructed further west, adjacent and parallel to the railroad bridge. Upon removal of the old bridge in 1950 and its abutments and fender system in 1951 the area of the bayou north bank which constituted the old bridge property was no longer protected, and the fall of the bank, which in April 1951 was reported by an engineer employed by plaintiff to be at the rate of two feet a month, accelerated in 1950 and 1951 due to these removals. This area adj oined the west end of plaintiff’s property.
14. Between 1934 and 1951 there was continuous and gradual caving and recession of the bank of plaintiff’s property to the north, which was greatly accelerated in 1950 and 1951. In 1950 the property had caved and receded to a line dangerously close to plaintiff’s principal buildings, that is, 10 or 11 feet from the westerly end and 2 or 3 feet from the easterly end, and plaintiff consulted an engineer who was skilled and experienced in such matters. After carefully inspecting the bank of the stream and the building facilities, the engineer advised plaintiff that unless protective steps were taken immediately the buildings were in imminent danger of being lost, due to the caving of the bank of plaintiff’s property. He recommended the construction of a steel sheet pile bulkhead as a protective measure.
15. Under date of April 4,1951, plaintiff wrote to the area U. S. District Engineer setting forth the circumstance of the loss of its property by the cavings of the bank and consequent recession of the shore line over the years, attributing these conditions to the dredging operations conducted by the Corps of Engineers, and demanding that defendant construct a protective device and pay plaintiff for'the value of the land lost due to prior cavings. The letter further stated that upon defendant’s failure, to do so, such protective device would be constructed by plaintiff and that defendant would be held responsible for the cost involved.
*102 Plaintiff’s demands were rejected by letter dated April 18, 1951, addressed to plaintiff by the U. S. District Engineer.
16. Thereafter, having again been advised by its consulting engineer that the construction of a protective device should not be delayed any longer, plaintiff, after discussions with the District Engineer, submitted an application on April 27, 1951, for a permit to erect a steel sheet pile bulkhead across practically the entire face of plaintiff’s property and extending beyond its property on the west. The proposed bulkhead was recommended and designed by plaintiff’s consulting engineer. Plaintiff’s engineer had originally designed the bulkhead for construction along the north line of a proposed project channel of the stream, which “proposed project channel” was never adopted.[1] In verbal discussions prior to filing the formal application, such alignment was rejected by the District Engineer. Therefore, plaintiff’s original application located the proposed bulkhead 10 feet landward, that is, to the north, of the north limit of the proposed project channel.
Under date of May 8, 1951, the District Engineer advised plaintiff, in part, as follows:
The plans accompanying your application have been reviewed, and it is noted that the alignment of the bulkhead is 10 feet landward of the proposed north limit of project channel contour. If you will recall, at the last conference request was made that the bulkhead be installed at a distance of 20 feet landward of this line. It is therefore regretted that I find it necessary to return your plans for this correction.
17. Although protesting that both the proposed 10 and 20 foot locations of the bulkhead north of the north limit of the proposed project channel would be an encroachment on its property, plaintiff nevertheless amended its application.
On June 18, 1951, the U. S. Corps of Engineers issued a permit to construct and erect such steel sheet pile bulkhead of the dimensions and type applied for, having a length of 236 *103 feet, and located on and extending. beyond and west of plaintiff’s property along a line 20 feet north of the proposed north limit of the project channel. At the time of construction, however, defendant’s inspector, based on his own measurements, insisted that the bulkhead site be five feet further north. Plaintiff protested this further extension on its land but finally agreed to this because of the imminent danger to plaintiff’s property. The bulkhead was finally built in the water just at the water’s edge.
18. On August 18, 1951, plaintiff entered into a written contract with the Kansas City Bridge Company for the construction of the bulkhead in accordance with the permit. This work was completed and accepted by plaintiff on November 5, 1951. The total cost of erecting the bulkhead, including construction contract, engineering, supervision, and legal incidentals was $45,395.71, all of which was paid for by plaintiff.
19. The construction and installation of the sheet steel pile bulkhead by plaintiff completely stabilized the bank of the stream on plaintiff’s property, and there has been no bank caving or recession since the date of its construction in 1951.
20. Plaintiff’s suit is based on a claim that the continuing and gradual caving and recession of the north bank of the bayou forming part of its property which resulted in the loss or loss of economic use of it, was the direct result of repeated dredgings of the channel by the U. S. Corps of Engineers.
21. There is nothing peculiar about the soil forming the bank and slopes of plaintiff’s property, it being typical of the area in which it is located. Soil of the nature of this soil might tolerate a slope as steep as 1 foot vertical to 1 foot horizontal under certain conditions, undisturbed and underwater, but under the conditions of trafile in Bayou Plaque-mine soil of the subject type would not tolerate a slope steeper than approximately 1 foot vertical to 4 feet horizontal.
22. The dredging in Bayou Plaquemine on or adjacent to plaintiff’s property was conducted by a method known as “box-cutting”; box-cutting consists of dredging or cutting the banks of the channel to the desired depth at a perpen *104 dicular or vertical cut or face. However, it is normal and necessary to exceed the side limits (by half the distance of the slope if it was a “one on two”) so as to provide an area for the overlying soil of the bank to fall or cave to a tolerable slope above the channel depth; otherwise the bank soil would move into the bed of the stream until its angle of repose was attained. The water area in front of plaintiff’s property is 200 feet wide, and the project width of the channel is 100 feet.
The defendant’s dredge operators were instructed to dredge with care in this area in order not to affect the banks. It is not proved that the dredges at any time after 1934 cut into the underwater bank in front of plaintiff’s property, close enough to plaintiff’s property to cause plaintiff’s land to cave. The evidence indicates that the material removed from the tailbay was silts and soft sands.
23. It has been the policy of the Corps of Engineers in this area to use either a government-owned dredge, or a contract dredge under lease, to restore channel depth in the dimensions previously stated, that is, 100 feet wide and minus 9 feet deep mean gulf datum. During the 10-year period, and prior to the construction of the bulkhead by plaintiff in front of its property in 1951, dredging operations were carried on in the tailbay in front of that property in 1942,1944,1945,1948,1949,1950, and 1951. The dredging was accomplished pursuant to directives issued by the District Engineer. In each of these years only maintenance dredging was authorized. Maintenance dredging, as distinguished from new dredging, consists only in removing silt which has been deposited in the bed of the stream since the last dredging operation. The purpose of maintenance dredging is merely to restore the ordinary project dimension consisting of a 100-foot channel dredged to minus 9 feet mean gulf datum.
24. All dredging operations were carried out under the direction of a field representative of the District Engineer. In addition, a chief inspector and sufficient deputy inspectors to permit a twenty-four hours a day operation were assigned to supervise the work. Those in charge of dredging operations for the defendant were at all times conscious of the fact that care should be exercised in dredging this tailbay *105 area. The written directives for the years 1947, 1948, and 1949 contain the following statement: “The width of the channel in this area will be determined by the existing underwater banks and care will be taken not to over-dredge to such extent that the over-banks will be affected”. In addition, the 1950 directive contained a statement that limits of dredging must be rigidly controlled in the area.
25. Actual dredging operations were confined, so far as possible, within the limits of the navigation channel, but because of the contour of the tailbay of the lock and the traffic congestion the usual methods of determining and marking the alignment of the channel could not be followed, and such lines were determined, first by the establishment of a center line measured from existing water’s edge to water’s edge on each side of the stream. The dredge was then anchored on or close to this center line and its equipment adjusted to control the dredging operation within fifty feet on each side of the center line so established.
28. For many years all dredging in Bayou Plaquemine in the tailbay of the Plaquemine lock has been performed with hydraulic dredges which consist generally of a vessel equipped with a boom on the front end that is lowered into the water. This boom has a suction pipe attached, which is equipped with a rotor or cutter head which cuts and loosens the dirt to be excavated, and this material is picked up by the suction pipe and pumped to another location.
The type of dredge used in this area was the usual suction dredge with a draft of some 7% feet. It would ordinarily be placed as close to the center line of the channel as passing traffic would permit. The dredge would then be swung on an arc to the project dimensions. The material removed during dredging operations included the so-called silt or soft sand representing material which has been deposited by the waters from the lock or by normal silting of the banks. Some of these materials probably came from the banks of the stream as the result of the propeller wash of tugboats operating near the banks or of the effect of the bumping of the bank by tugs and tows. Some of the land which caved in or sloughed off into the water from time to time was ultimately a part of the material dredged from the stream.
*106 27. Plaquemine Lock is opened and closed on an average of 6 to 10 times a day. In 1945 it was opened and closed a total of 2,433 times, in 1946 3,290 times, in 1947 3,341 times, in 1948 3,093 times, in 1949 3,212 times, in 1950 2,677 times and in 1951 a total of 3,253 times. With each opening and closing of the lock silt in suspension in the waters of the Mississippi River came through the lock and was deposited in the tailbay.
28. There are no records in evidence of dredging operations in the Plaquemine Lock area during the years prior to 1945, and there are no records available of the quantity and kind of material which has been dredged from the bayou at plaintiff’s property since 1945. However, the records of dredging operations over the entire area, which includes the forebay, the lock chamber, and the tailbay of the lock, from 1945 to and including 1955, indicate the following:

Quantities and types of materials which were dredged from the channel in the Plaquemine Lock area 1945-1955

Year Total Quantity (cu. yds.) Average per 100 ft. Stn. (cu. yds.) Type of material
Percent Silt Percent Sand Percent Mud Percent Olay
1945. 93,480 52.4 8.6 39.0
1946. ([1]) ([1]) ([1]) ([1]) ([1])
1947. 85,115 60.0 20.0 20.0
1948. 41,900 79.5 13.1 7.4
1949. 12,000 80.0 20.0
1950. 21,210 40.0 60.0
1951. 69,749 30.0 70.0
1952. (?) 75.0 5.0 20.0
1953. 48,460 55.0 45.0
1954. ([1]) ([1]) ([1])
1955. ([1]) ([1]) ([1])
These figures do not show how much and what types of material were actually dredged from the tailbay alone or whether any of the material came from the banks of plaintiff’s property.
29.Plaintiff’s property had a frontage on the bayou of approximately 245 feet. Using the averages shown in the computation included in finding 30 the quantities and types of materials dredged from the area of the bayou in front of plaintiff’s property are as follows:
*107 Year Quantity (cubic yards) (average x 2.45) Type of material (cubic yards)
Silt Sand Mud Clay
1945-7,570 3,967 651 2,952
1946-
1947-4,839 2,903 968 968
1948-4,361 3,468 571 322
1949-2,205 1,764 441
1950-3,246 1,298 1,948
1951. 6,983 2,095 4,888
1952-3,675 2,756 184 735
1953-6,983 3,841 3,142
1954-
1955-
Totals.. 39,862 22,092 12,793 3,920 1,057
These average are not very helpful, but do appear to indicate that as much material was removed in 1953, two years after the steel bulkhead was completed and after the caving and recession of plaintiff’s bank was halted (see finding 19), as was removed in 1951, and more material was removed in 1953 than was removed in all prior years except 1945.'
30. Subsequent to 1926 and prior to the commencement of the caving of the bank at the upper level in 1934, the lower shelf or plateau was actually used by plaintiff in the conduct of its business. This lower area or plateau and the area comprising the slope of the bank from the lower to the high level was of substantial value and use to plaintiff in serving as a natural protection to the area on the top level where plaintiff’s plant and facilities were located.
Neither the area of land between the 1934 top of bank line and the 1951 top of bank line, nor of the area comprising the slope of the bank and the lower shelf or plateau, can be accurately determined. The evidence indicates, however, that in approximate measurements, the area which was lost, or the use of which was lost, to plaintiff prior to 1951 when the bank was stabilized by the construction of the steel sheet pile bulkhead, was as follows:

Loss of Surface Area and Bank Soil (Square Feet)

Total area, between 1907 and 1951- 19, 689
Lower shelf or plateau, prior to 1934_ 2, 625
Area, between 1934 and 1951_ 17,064
*108 Location:
Bank, under low water level (1951) CO Cl to
Bank, above low water level (1951). CD Cl
Surface area of upper level:
3,068 1934 caving_
2,695 Subsequent to 1934_
- 5,758
17,064
31. By constructing the steel sheet pile bulkhead in 1951 plaintiff in effect restored protection oí its property on the upper level, which protection had theretofore been afforded by 11,306 square feet of bank soil before it had caved and sloughed off into the bayou. The cost to plaintiff of restoring this protection was the cost of the bulkhead, namely, $45,395.71.
32. As a result of the caving and sloughing of the protective bank soil, 5,758 square feet of the surface area of plaintiff’s property, upon which its plant and facilities were located, subsided to the slope and became lost to plaintiff. The loss of 3,063 square feet of this property occurred in 1934; the subsidence of the remaining 2,695 square feet was gradual and extended over a period of later years, except for the acceleration noted in finding 13.
33. It is not proved that the loss of plaintiff’s land as described in these findings was caused by the dredging operations by defendant.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is therefore dismissed.

 This “proposed project channel” has reference to the dredging of the channel to a point north of the then (1950) existing northern limit line, which dredging was required by the terms of a permit granted to the Louisiana State Highway Department for the construction of the new highway bridge to which reference is made in finding 13. Plaintiff’s consulting engineer proposed placing his steel bulkhead parallel to the limit line at this point.

 There was no dredging in 1946, 1954, and 1955.