Don and Gayle **APPLEGATE,** et al., Plaintiffs,

v.

The **UNITED STATES,** Defendant.

No. 92–832L.

United States Court of Federal Claims.

June 14, 1993.

Gordon H. Harris, Cocoa Beach, FL, for plaintiffs. Jack A. Kirschenbaum, of counsel.

Edward J. Passarelli, Washington, DC, with whom was Acting Asst. Atty. Gen., Myles E. Flint, for defendant. Russell W. Petit, Lloyd Pike, and John Brady, Army Corps of Engineers, of counsel.

## OPINION

NETTESHEIM, Judge.

This case is before the court after argument on defendant's motion to dismiss for lack of subject matter jurisdiction due to the bar of the six-year statute of limitations. Plaintiffs sue under the fifth amendment to the United States Constitution seeking recovery of compensation for erosion and flood damage to their properties allegedly caused by the Army Corps of Engineers (the "Corps") in constructing and maintaining a harbor project. Plaintiffs also pray for an injunction requiring the building and operation of a sand transfer facility or, in the alternative, an award of damages to cover the costs of such construction.

## FACTS

The following facts are undisputed and, except as noted, derive from the complaint. Plaintiffs [1] are owners of beachfront property nearby or adjacent to Port Canaveral and Sebastian Inlet in Brevard County, Florida. This coastline fronts on the Atlantic Ocean to the south of the projection of Cape Canaveral ("the Cape"). Prior to the events giving rise to this action, the area consisted of a 41–mile long arc of white sandy beaches. Due to a natural southerly littoral flow of sand,[2] the beaches south of the Cape accreted two to three feet each year. This littoral sand flow both created the beaches and replenished them with sand.

In 1945 Congress passed the River and Harbor Act of 1945, Pub.L. No. 79–14, §§ 1–2, 59 Stat. 10, 16 (1945) (partially codified at 33 U.S.C. § 603a (1988)), which authorized "the construction of works of improvement, for navigation or flood control" in numerous areas of the country, including Canaveral Harbor. The Act also provided for the operation and maintenance of the Canaveral Harbor Project (the "Project") by the Corps. Plaintiffs allege that the Project as constructed included the following components: 1) dredging of a channel in the Atlantic Ocean; 2) cutting a passage from the Atlantic through a barrier island into the Banana River Lagoon; 3) constructing a harbor and turning basin in the lagoon; and 4) building two jetties to protect the harbor entrance. Construction commenced in 1950. In November 1953 the Corps completed the south jetty; in September 1954 the north jetty was completed. At oral argument plaintiffs represented several additional facts. Since 1955 the Project also included maintenance dredging of the channel connecting the ocean to the harbor, performed every 18 months. Plaintiffs pointed out that in 1956–57 the Corps deepened and widened the port. In 1958 the Corps extended the north jetty; in both 1961 and 1975, the Corps deepened the channel. In 1986 the port was further enlarged.

The Corps' construction of the protruding jetties and commencement of maintenance dredging blocked the southward littoral flow of sand. During oral argument plaintiffs stated that erosion and flooding began in 1952. Consequently, the shoreline north of harbor entrance accreted, while the coastline to the south receded. Plaintiffs contend that, although these phenomena manifested themselves immediately after the Corps began construction, beach erosion continues to the present day. The Project's blocking of the sand flow also caused flooding of plaintiffs' land upland of the mean high tide line. This flooding, in turn, has contributed to continued beach erosion. Moreover, the mean high tide line has moved progressively west-

---

**1.** As of March 24, 1993, there were 217 named plaintiffs in this case.

**2.** A littoral flow of sand is a "river" of sand which flows parallel to the coastline between the high and low tide water lines.

ward. Plaintiffs claim that the resultant flooding inundated each of their properties. In 1966 the public became aware that the Project caused beach erosion in the vicinity. Plaintiffs assert that the Corps foresaw that the Project's activities would cause erosion and flooding. To date approximately 400 feet of beachfront has eroded away.

In 1962, pursuant to the River and Harbor Act of 1962, Pub.L. No. 87–874, § 101, 76 Stat. 1173, 1174 (1962) (partially codified at 33 U.S.C. § 426e–g (1988)), Congress authorized the construction of a sand transfer plant at Canaveral Harbor. Congress appropriated $5,076,000.00 for this purpose. In 1967 the Corps presented a $1,300,000.00 plan to rebuild the beaches and construct a sand transfer plant. In 1968 the Senate Public Works Committee and the Florida Department of Natural Resources approved the sand transfer/beach rebuilding plan. After letting out bids, in August 1971 the Corps announced an indefinite delay in construction in order to conduct further research and development. The Corps also proposed an interim beach renourishment plan. In October 1988 the Corps proposed a $5,000,000.00 plan to construct a sand transfer facility system to transfer sand from north of Canaveral Harbor to the south. Plaintiffs allege reliance on the Corps' various pronouncements. To date the Corps has not built a sand transfer facility, and, as previously noted, erosion and flood damage continue.

According to plaintiffs, the jetties and periodic channel dredging have so far blocked $68,000,000.00 worth of sand. But for the Project, this sand would deposit on plaintiffs' properties south of the Canaveral Harbor. Consequently, the State of Florida and local jurisdictions placed zoning restrictions on plaintiffs' properties. Specifically, plaintiffs claimed at oral argument that setback restrictions now limit the structures that plaintiffs may erect on their properties due to the ocean's proximity. These restrictions have limited plain-

tiffs' ability to enjoy their properties. Plaintiffs allege that the beach erosion and attendant flooding will eventually completely destroy, *i.e.*, wash away, their properties.[3]

Although this particular case is of recent genesis, one plaintiff previously brought suit concerning the same matter. In 1970 Robert G. Pitman, Jr., filed an action in the United States Court of Claims under the fifth amendment and the Tucker Act, 28 U.S.C. § 1491 (1964), to recover compensation for the taking of five acres of beachfront property. *Pitman v. United States*, 198 Ct.Cl. 82, 457 F.2d 975 (1972). The parties agree that the *Pitman* property constitutes at least part of the properties at issue in the case at bar. The Court of Claims dismissed the complaint on defendant's motion for summary judgment, holding in part that defendant had not directly invaded or appropriated Mr. Pitman's property. 198 Ct.Cl. at 87, 457 F.2d at 977–78 (citing cases).

On December 4, 1992, plaintiffs filed suit in the Court of Federal Claims. Plaintiffs pray for damages in excess of $100,000,-000.00 for defendant's alleged taking without compensation, and, by a proffered amendment to their complaint, an order requiring the Corps to construct and operate a sand transfer facility, as well as interest, attorneys' fees, and costs.

## DISCUSSION

1. Defendant moves to dismiss the complaint pursuant to RCFC 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(4) for failure to state a claim upon which relief can be granted. The former ground is the gravamen of defendant's motion, since defendant takes the position that plaintiffs' claim is time barred; dismissal is sought under Rule 12(b)(4) only with respect to the prayer for an order that the Corps take steps to restore the littoral flow of the river of sand. Conceding defendant's motion as to the latter ground, plain-

---

**3.** Plaintiffs also claim potential and actual environmental damage as a result of the Corps' activities. First, plaintiffs allege that heavy storms may cause "blow-out" of portions of the barrier island, allowing seawater into the lagoon and thereby endangering marine wildlife. Second, plaintiffs allege actual damage to sea turtle nesting areas on Brevard County beaches.

tiffs seek to amend their complaint by asking for damages based on the cost of construction and operation of a sand transfer facility, rather than an order requiring the Corps affirmatively to undertake these measures. Accordingly, the court directs its attention to defendant's arguments relating to the statute of limitations.

■ The statute of limitations is jurisdictional in the Court of Federal Claims. *Soriano v. United States*, 352 U.S. 270, 273, 77 S.Ct. 269, 272, 1 L.Ed.2d 306 (1957) (discussing this court's predecessor, the Court of Claims); *Hart v. United States*, 910 F.2d 815, 817, 818 (Fed.Cir.1990); *see United States v. Mottaz*, 476 U.S. 834, 841, 106 S.Ct. 2224, 2229, 90 L.Ed.2d 841 (1986). The rationale is that, in derogation of the sovereign's immunity, Congress conferred jurisdiction to entertain certain claims and that no others could be asserted against the Government, including time-barred claims. Accordingly, the statute of limitations must be strictly construed. *Kirby v. United States*, 201 Ct.Cl. 527, 539 (1973), *cert. denied* 417 U.S. 919, 94 S.Ct. 2626, 41 L.Ed.2d 224 (1974). In *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979), the Supreme Court noted that statutes of limitations

> which 'are found and approved in all systems of enlightened jurisprudence,' *Wood v. Carpenter*, 101 U.S. 135, 139 [25 L.Ed. 807] (1879), represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that 'the right to be free of stale claims in time comes to prevail over the right to prosecute them.' *Railroad Telegraphers v. Railway Express Agency*, 321 U.S. 342, 349 [64 S.Ct. 582, 586, 88 L.Ed. 788] (1944). These enactments are statutes of repose; and although affording plaintiffs what the legislature deems a reasonable time to present their claims, they protect defendants and the courts from having to deal with cases in which the search for the truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise.

444 U.S. at 117, 100 S.Ct. at 356 (citing cases).

■ The statute of limitations defense is affirmative and must be pleaded. RCFC 8(c). Accordingly, the general rule is that the Government bears the burden of proof as to the statute of limitations defense, and a plaintiff has the burden of proving an exception to the statute of limitations. *Duvall v. United States*, 227 Ct.Cl. 642, 646, 652 F.2d 70 (1981); *accord Warner v. United States*, 223 Ct.Cl. 754, 755 (1980). This allocation of the burden harmonizes with the court's review of a motion to dismiss.

■ When evaluating a motion to dismiss for subject matter jurisdiction pursuant to RCFC 12(b)(1), the allegations of the complaint should be construed favorably to the pleader, *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), to the end that the court must accept as true the facts alleged in the complaint. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir. 1988). In *W.R. Cooper General Contractor, Inc. v. United States*, 843 F.2d 1362, 1364 (Fed.Cir.1988), the court stated: "In cases such as this in which a party has moved to dismiss for lack of jurisdiction, we must consider the facts alleged in the complaint to be correct. If these facts reveal any possible basis on which the nonmovant might prevail, the motion must be denied." (Citing *Scheuer v. Rhodes*, 416 U.S. at 236, 94 S.Ct. at 1686; additional citations omitted.) However, the burden is on a plaintiff to establish jurisdiction. *Reynolds*, 846 F.2d at 748 (citing cases). It should be noted that this is a case asserting an alleged unconstitutional taking. The Federal Circuit has characterized such cases as "fact-intensive," cautioning against "precipitous grants of summary judgment." *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 887 (Fed.Cir.1983); *see also Whitney Benefits, Inc. v. United States*, 752 F.2d 1554, 1559–60 (Fed.Cir. 1985); *Skaw v. United States*, 740 F.2d 932, 939 (Fed.Cir.1984). The court's task is limited in reviewing the sufficiency of a

complaint. The issue is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. at 236, 94 S.Ct. at 1686. In the absence of subject matter jurisdiction, the court has no authority to reach the merits, even if it is in the interest of justice to do so. *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 818, 108 S.Ct. 2166, 2179, 100 L.Ed.2d 811 (1988).

2. 28 U.S.C.A. § 2501 (West Supp.1993), provides that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." A cause of action first accrues when "all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence." *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed.Cir.1988) (emphasis in original). Defendant argues that plaintiffs' claim is time-barred because the alleged flood and erosional damage to the various properties occurred more than six years prior to the filing of the complaint, or by December 4, 1986. In particular, defendant refers to plaintiffs' allegations that effects of the Project manifested themselves in the early 1950's. Compl. filed Dec. 4, 1992, ¶ 9. Plaintiffs even pinpoint 1950 as the date of the taking. Compl. ¶ 27. Moreover, defendant argues plaintiffs acknowledge that the public has known the cause of the erosion and flooding since 1966. Compl. ¶ 20. Therefore, according to defendant, the statute of limitations ran on plaintiffs' claim many years ago. Relying primarily on *United States v. Dickinson*, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947), plaintiffs respond that the alleged taking has been continuous from 1950 to the present and therefore a new statute of limitations begins to run each time the Corps dredges the harbor area. In the alternative, plaintiffs argue that, due to intervening case law, their cause of action was not created until 1988.

*Dickinson* provides the legal underpinning for statute of limitations jurisprudence in flooding/erosion takings cases. In *Dickinson* the Government constructed a dam causing an impoundment of water that inundated plaintiffs' properties and eroded their riverbanks. On July 1, 1936, the Government gave plaintiffs notice of the proposed river pool elevation. Impoundment began three months later. On August 20, 1937, the Government completed the dam. However, the river did not reach its maximum pool level until September 22, 1938. Plaintiffs in *Dickinson* filed their complaint on April 1, 1943. They sued the Government for the value of easements taken to permanently and intermittently flood their land and for erosion damage. The main issue before the Supreme Court was whether plaintiffs filed their action within the six-year statute of limitations. Defendant contended that the statute began to run in 1936 when the dam first impounded water. Defendant alternatively argued that the statute began to run in 1937 when the pool level first exceeded the normal river level and flooded plaintiffs' property.[4]

The Court began by observing that "[t]he Fifth Amendment expresses a principle of fairness and not a technical rule of procedure...." 331 U.S. at 748, 67 S.Ct. at 1384. Rejecting a rule which would force a plaintiff to sue "as soon as inundation threatens," *id.* at 749, 67 S.Ct. at 1385, the Court explained:

If suit must be brought, lest he jeopardize his rights, as soon as his land is invaded, other contingencies would be running against him—for instance, the uncertainty of the damage and the risk of *res judicata* against recovering later for damage as yet uncertain. The source of the entire claim—the overflow due to rises in the level of the river—is not a single event; it is continuous. And as there is nothing in reason, *so there is nothing in legal doctrine, to preclude the law from meeting such a process by postponing suit until the situation becomes stabilized.* An owner of land

4. This would bar plaintiffs' claim only because ... they acquired the land after that date.

flooded by the Government would not unnaturally postpone bringing a suit ... for the flooding *until the consequences of inundation have so manifested themselves that a final account may be struck.*

When dealing with a problem which arises under such diverse circumstances procedural rigidities should be avoided. All that we are here holding is that when the Government chooses not to condemn land but to bring about a taking by a continuous process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really "taken." ...

*Id.* (emphasis added). The Court went on to hold that plaintiffs' claims were brought within the statute of limitations.

Plaintiffs in the case at bar argue that *Dickinson's* "stabilization" and "final accounting" language constrains the court to deny defendant's motion because the Corps' Project activities (maintenance dredging and resultant flooding and erosion) constitute a continuing-taking that has not stabilized. Plaintiffs distill a two-prong test from *Dickinson.* The first prong queries whether the erosive or other takings situation has stabilized. They argue that "stabilize" means the time when the erosional activity ceases or, in a dam case, when the maximum pool level is achieved. Thus, only if the Corps constructed a sand transfer plant or plaintiffs' land completely washed away would the limitations period begin to run. If the situation has stabilized, then and only then a court may look to the quantum or manifestation of the damage to formulate a "final accounting" of all the damage. According to plaintiffs, the erosive action on their properties has not stabilized and, therefore, no cause of action has accrued.

■ Plaintiffs read *Dickinson* too broadly. *Dickinson* recognized that flooding and erosion involve incremental and contin-

uous processes. As such, a court cannot require a landowner to sue immediately upon inundation. Rather, the nature of the invasion must be definite, certain, or foreseeable. *Dickinson* does not hold that continuous flooding and erosion indefinitely toll the statute of limitations or that a new cause of action accrues with each flood or erosional damage.

Subsequent decisions of the Supreme Court and the Court of Claims confirm this postulate. In *United States v. Dow,* 357 U.S. 17, 27, 78 S.Ct. 1039, 1047, 2 L.Ed.2d 1109 (1958), the Supreme Court described *Dickinson's* "expressly limited holding ... that the statute of limitations did not bar an action under the Tucker Act for a taking by flooding when it was uncertain at what stage in the flooding operation the land had become appropriated to public use...." The Court of Claims in *Columbia Basin Orchard v. United States,* 116 Ct.Cl. 348, 88 F.Supp. 738 (1950), addressed this issue with respect to fruit trees damaged by government-caused water contamination. Plaintiffs in the instant case contend that the actual contamination date constituted "stabilization," from which point the limitations period began to run. While there is some support for such an interpretation,[5] the Court of Claims also stated, "[W]e do not think the Supreme Court, in the *Dickinson* case, meant to hold that plaintiff was entitled to wait until any possibility of further damage had been removed...." 116 Ct.Cl. at 357, 88 F.Supp. at 739. The court continued that the fruit trees were incapable of commercial production in 1941; therefore, the court would not accept the orchard owner's plea to commence the limitations period in 1942, when financial backers abandoned the property as a producing orchard.

*Nadler Foundry and Machine Co. v. United States,* 143 Ct.Cl. 92, 164 F.Supp. 249 (1958), involved a continuous erosive condition beginning in 1926 and ending cir-

---

5. The Court of Claims held that the cause of action accrued by June 1940 when the contamination ended. 116 Ct.Cl. at 357, 88 F.Supp. at 739. The court also noted that the plaintiff might not have realized the extent of damage to

his fruit trees until 1941, the year after the water contamination. The court stated that even this later date, however, would not save plaintiff from the limitations bar.

ca 1951 with plaintiff's construction of anti-erosive steel bulkheads. Applying the analysis advanced by plaintiffs in this case, the bulkhead erection constituted stabilization because only then could the landowner assess the exact extent and expense of the taking. The court held that the limitations period ran "when, before 1934, the water had practically reached the bottom of the steep bank sloping up to the upper level land, ... [and] *the ultimate cave-in of that land was a foreseeable future event...*." *Id.* at 95, 164 F.Supp. at 251 (emphasis added). In *Barnes v. United States*, 210 Ct.Cl. 467, 538 F.2d 865 (1976), the Court of Claims further refined limitations jurisprudence in flooding and erosion cases. Plaintiffs alleged that a government-owned dam caused inundation and waterlogging by seepage onto their land. The court, relying on *Dickinson*, held that the Government did not take plaintiffs' land until "after it first became clearly apparent by the passage of time that the intermittent flooding was of a permanent nature...." 210 Ct. Cl. at 480, 538 F.2d at 873; *see also Cooper v. United States*, 827 F.2d 762, 764 (Fed. Cir.1987) (where court marked accrual of takings claim as that time when the extent of destruction was ascertainable, *i.e.*, the destruction itself having "sufficiently stabilized" in definite manner).[6] These cases instruct that it is the certainty, definiteness, or foreseeability of flooding or erosion, not complete impoundment or erosion of the last grain of sand, that defines the taking and triggers the limitations period. Interestingly, in *Barnes*, only four years elapsed before it was ascertainable that the flooding was of a permanent nature, thereby defining a taking and starting the limitations period.

In *Baskett v. United States*, 8 Cl.Ct. 201 (1985), *aff'd mem.*, 790 F.2d 93 (Fed.Cir.), *cert. denied*, 478 U.S. 1006, 106 S.Ct. 3300, 92 L.Ed.2d 714 (1986), the Claims Court, per Judge Lydon, cogently reviewed the cases in this area. The court held that a riverbank need not be completely washed away before the statute begins to run. The court described three distinct instances in which the statute of limitations begins to run:

1) Had the consequences of the inundation so manifested themselves that a final account could have been made of the damage?[7] or

2) Was the damage a foreseeable future event? or

3) Were the effects of the dam fully known by the landowners, *i.e.*, actual knowledge?

8 Cl.Ct. at 231. The court noted that many plaintiffs became aware of erosion shortly after dam installation. Moreover, even if plaintiffs did not have actual knowledge of the erosion, "often the mere passage of time is sufficient to presume that some of the erosion damage complained of would have manifested itself." *Id.* The court found that several plaintiffs simply sued too long after the pools were created to make a credible claim that they did not know of the erosion damage. For example, the Meldahl pool was elevated in March 1965. One plaintiff filed suit in July 1978. The accrual cutoff date therefore was July 1972. The court did not accept this plaintiff's representation that from 1965–1972 he had failed to noticed any erosion, stating that the damage would have manifested itself prior to 1972.

In *Chipps v. United States*, 19 Cl.Ct. 201, *aff'd mem.* 915 F.2d 1585 (Fed.Cir. 1990), the Claims Court further refined the *Baskett* standard, noting that

[t]he complete impoundment date, however, may apply in cases where the plaintiff admits the taking occurred at that time. Complete impoundment may also mark the accrual time in cases where the evidence indicates that permanent damage was foreseeable from that time forward....

---

6. Florida state law is not to the contrary. *See Hillsborough Cty. Aviation Auth. v. Benitez*, 200 So.2d 194 (Fl.Dist.Ct.App.), *cert. denied*, 204 So.2d 328 (Fla.1967). (Once damage is certain and the length of time known, the statute of limitations begins to run.)

7. The court warned that this did not preclude the possibility of any further damage to the riverbank.

19 Cl.Ct. at 205. In short, a plaintiff cannot postpone suit until the erosion damage is complete. On the other hand, a plaintiff may or may not postpone suit after impoundment or pool-creation, depending on how foreseeable or complete the damage is at that time.[8]

8. Plaintiffs contend that in every flood or erosion takings case, the court commenced the limitations period, *i.e.*, found "stabilization," only after complete impoundment or at the end of the erosive condition. This is not true. Limitations analysis in the takings area is more nuanced. Some courts have determined an accrual/taking date and count back six years from the date of the complaint and rule on whether plaintiff should have brought suit before that date. In *Baskett,* for example, the court rejected complete impoundment as the accrual date. 8 Cl.Ct. at 230. On the other hand, the court "[did] not agree that *Dickinson* necessarily requires that the riverbanks at issue ... be entirely washed away before a cause of action accrues...." *Id.* at 231. In *Gustine Land & Cattle Co. v. United States,* 174 Ct.Cl. 556 (1966), the court did not define when stabilization occurred. The court noted that the dam interrupted surface flows in 1947. But the court also indicated that plaintiffs' floodwater claims matured as early as 1948 when the floodwater patterns "had been so altered as to destroy any further reliance upon such waters as being beneficial to native pasture...." 174 Ct.Cl. at 652. Under either scenario plaintiffs' floodwater claims were time-barred.

In *Cooper,* 827 F.2d 762, plaintiff's trees began dying in 1979. By 1984 there were 75 acres of dead trees. In that year the Government, by removing the river obstruction, stopped the flooding and consequent damage to the trees. The court held that plaintiff sued within the limitations period because the extent of the destruction was not ascertainable until 1984. *Cooper* differs from the case at bar because plaintiffs claim ongoing and continuous erosion. Moreover, in *Cooper* plaintiff sued within six years from either the initial flooding or the last day of flooding. In *Mason v. United States,* 27 Fed.Cl. 832 (1993), the court did not base its ruling on the fact that the dam reached its final water level in 1975 and, therefore, that the limitations period ran as of 1981. Rather, the issue before the court was whether erosional processes were known, or, in any event, should have been known, to plaintiffs by December 1985, six years before the complaint was filed. Based on the witnesses' personal recollections, as well as expert testimony, the court held that plaintiffs knew or should have known of the taking above 626 feet mean sea level prior to December 1985. In *United States v. Dickinson,* 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789, the Court implied, but did not explicitly hold, that the final water level constituted the taking date. As in the instant case, the court did not reach the precise issue of the exact taking date. The Court held: "[W]e find that the taking ... was not complete six years prior to April 1, 1943, nor at a time preceding Dickinson's ownership...." 331 U.S. at 749, 67 S.Ct. at 1385. (Plaintiffs acquired the subject property on August 16, 1937. *United States v. Dickinson,* 152 F.2d 865, 866 (4th Cir. 1946)).

At oral argument plaintiffs presented an intriguing formulation of the beachfront properties at issue as a dam without a cap. While the date of complete impoundment is a factor in limitations analysis, it is not dispositive. In some dam cases impoundment (or, in an erosion case, complete erosion) may constitute accrual, *e.g., Dickinson,* in other cases an earlier accrual date is found depending on the extent of the erosion or flooding, *e.g., Nadler.* The instant case involves both flooding and erosion. Plaintiffs concede knowledge of the nature and cause of the erosion and flooding well before the erosional equivalent of complete impoundment. In such a case, the limitations period commences before the last grain of sand is washed away. Although dams do have caps, or maximum levels to which water can be raised, that beachfronts do not have such caps does not compel the conclusion that the statute of limitations can only apply to beach erosion cases after the erosion is complete as to a given property owner. A continuous 30 year-long erosional and flooding process qualitatively differs from a dam at maximum level that is then raised further pursuant to government decision. In the former case, erosion commences at a finite point and continues indefinitely. In the latter a separate decision causes another taking. In the case at bar, plaintiffs allege that the construction and maintenance dredging flowed from a single decision and caused immediate effects that continue to the present day. Contrary to plaintiffs' argument, it does matter that the Corps' maintenance dredging formed part of a plan openly conceived and implemented in the early 1950's and carried out to the present day.

During oral argument plaintiffs presented a hypothetical scenario by means of an exhibit entitled "What about the next owner/Logic and Reason." In the hypothetical owner A represents a current beachfront plaintiff, while owner B represents a non-party property owner whose property is situated directly behind A's. Plaintiffs query that if owner B has a claim once the beach has eroded his property, how can the court say that owner A does not have a claim when erosion affects his property? Defendant aptly responded that even now owner B would not necessarily have a claim because as of 1954 the Government imposed a permanent servitude on the littoral flow of sand. This servitude placed all landowners in the vicinity on notice that erosion to the barrier island would commence and continue.

3. Statute of limitations issues in takings cases are highly fact-specific and "[a]dopting ... [the] date of taking must often be done in a somewhat imprecise manner, this aspect of the cases being in the nature of a jury verdict....." *Barnes,* 210 Ct.Cl. at 480, 538 F.2d at 873 (citation omitted). In this case the court confronts a relative dearth of facts as to how the erosional damage manifested itself on plaintiffs' beachfront property. However, the record reveals that plaintiffs have admitted that flooding and erosional damage manifested themselves many years prior to December 2, 1986, and the record amply supports a finding that plaintiffs knew or should have known of this damage by 1966.

The facts which mark accrual in this case are few. First, plaintiffs allege that beach erosion "occurred immediately after work began on the project [i.e., 1950], accelerated after the construction of the two jetties [i.e. 1953–54], and continues to occur to this day...." Compl. ¶ 9. Plaintiffs readily admit that the Corps took their properties during or about 1950. *Id.* ¶ 27. Second, plaintiffs allege that "[i]n 1966, the public first became aware that the Canaveral Harbor project was the cause of significant erosion to Brevard County's sandy beaches." *Id.* ¶ 20. Third, at least one plaintiff, Mr. Pitman, filed suit under the same cause of action in 1970. *See Pitman v. United States,* 198 Ct.Cl. 82, 457 F.2d 975. Taken together, these facts lead to the ineluctable conclusion that significant flooding and erosional damage to plaintiffs' property occurred well before 1986. Plaintiffs could foresee, beginning in 1966, if not earlier, that the Project would cause serious damage to their properties. In particular, the allegations of the complaint support a finding that plaintiffs' land was appropriated for public use prior to 1986.[9]

4. Plaintiffs also argue that the Corps' annual maintenance dredging constitutes a separate act which starts a new limitations period each year. The court views the maintenance dredging as an integral part of the Project. Plaintiffs allege that the Project, as conceived, included maintenance dredging.[10] Compl. ¶ 8. Thus, dredging constitutes a part of a single on-going project. Moreover, plaintiffs allege that erosion and flooding commenced immediately after the Project's inception. *Id.* ¶ 9. They do not allege that they were unaware that periodic dredging would be required. From 1966 the public was aware of the cause of the erosive conditions. The damage from the dredging commenced immediately and inevitably recurred each year afterwards. As such, plaintiffs were on notice, as of 1954, that the Project would block sand and that the Corps would periodically dredge sand in order to sustain the Project. In these circumstances the Project's maintenance dredging does not commence a new limitations period.

5. Plaintiffs appear to ask the court to invoke the continuing violation or claim doctrine often seen in employment and contract cases involving limitations periods. *See Levadi v. United States,* 137 Ct.Cl. 97, 100, 146 F.Supp. 455, 456 (1956), *cert. denied,* 353 U.S. 917, 77 S.Ct. 665, 1 L.Ed.2d 664 (1957); *Friedman v. United States,* 159 Ct.Cl. 1, 7–8, 310 F.2d 381, 384 (1962), *cert. denied,* 373 U.S. 932, 83 S.Ct. 1540, 10 L.Ed.2d 691 (1963); *Cannon v. United States,* 137 Ct.Cl. 104, 108, 146 F.Supp. 827, 830 (1956); *Odell v. United States,* 134 Ct.Cl. 634, 637, 139 F.Supp. 747, 748–49 (1956). Under this doctrine "if defendant owes a continuing duty, a new cause of action arises each time the government breaches that duty...." *Cherokee Nation of Okla. v. United States,* 26 Cl. Ct.

---

9. The Government allegedly made statements regarding the construction of a sand transfer facility upon which plaintiffs relied. These statements do not impact the court's decision. First, plaintiffs concede knowledge of the cause and effect of the flooding and erosion. Second, as defendant noted, misstatements, opinions, and even outright fabrications do not toll a claim where plaintiff is on notice or the alleged

injury is not inherently unknowable. *Kubrick,* 444 U.S. at 114, 123, 100 S.Ct. at 355, 360.

10. The court notes that maintenance dredging has serious environmental consequences to aquatic wildlife, plants, and potentially to human life.

798, 803 (1992) (citation omitted). In the context of employee pay cases, this doctrine regards each missed payment to an employee as a separate claim that does not accrue until the payment due date.

The Court of Claims limited the scope of the doctrine. In *Roberts v. United States*, 151 Ct.Cl. 360 (1960), the court noted that the doctrine can undermine the very purpose of a statute of limitations:

> [T]he purpose of the statute of limitations is not defeated or undermined in entertaining claims, the operative facts of which first occurred over six years ago, as long as the facts necessary to a determination of those claims are before us with certainty and not obscured by the dust of years.

*Id.* at 363. Later decisions reaffirmed this formulation, applying the continuing claims doctrine when the facts were certain, discovered, and undisputed. *Waite v. United States*, 230 Ct.Cl. 731, 733–34 (1982), *cert. denied*, 459 U.S. 1103, 103 S.Ct. 724, 74 L.Ed.2d 950 (1983). In *Hart v. United States*, 910 F.2d 815, 818 (Fed.Cir.1990), the panel indicated serious disagreement with the doctrine, but did not purport to overrule it.

The court declines to apply the doctrine in this case. First, plaintiffs do not cite to any decision in the takings area that applies the doctrine, and the court finds no support for such an application. Given the pronouncements cited previously in flooding and takings cases, it appears unlikely that anyone thus far has envisaged applying the doctrine in such cases. Second, the court does not view the Corps' annual dredging as a separate and distinct activity from the Project as a whole since its inception in 1950. In pay cases each time an employer fails to pay an employee, the employer commits a discrete wrong. Here, the continued dredging and erosion and flooding in this case follow from the initial decision to construct the Project and main-

tain it in a manner that obstructed the southerly littoral flow of sand. As the court cogently noted in *Gustine Land & Cattle Co. v. United States*, 174 Ct.Cl. 556, the Project is a "dynamic undertaking:"

> If any landowner whose water rights are in any manner affected by the ... project may postpone suit "until the situation becomes stabilized," using the ... project as a whole as the "situation," there would be no end to the potentials for litigation. Unless the effects of the project can be identified within reasonable limits and ascribed to some specifics in point of time, suits for the loss of floodwaters of which the landowner was deprived in the 1940's would lie in the year 2000 and beyond.

174 Ct.Cl. at 657. Third, the policy implications of applying the doctrine to takings cases are ominous. Plaintiffs already sue over 40 years after the initial construction. Applying the continuing claims doctrine could enable plaintiffs to postpone suit in perpetuity as long as the Corps continues to maintain the Project. Were this the case, many takings cases would linger unlitigated for decades while many plaintiffs, like those in the case at bar, fully aware of the damage, waited for an auspicious occasion to sue.[11]

5. The court does not read *Owen v. United States*, 851 F.2d 1404, 1412–13 (Fed.Cir.1988), as creating a new cause of action because it overruled *Pitman*, the case unsuccessfully presented by one of plaintiffs in 1970. Plaintiffs argue that *Pitman's* holding that no taking could occur as to damage to land above the mean high tide line due to the Government's navigational servitude froze any possible suit until *Owen* removed the impediment to sue. According to plaintiffs, *Owen* resuscitated plaintiffs' claims that were brought within six years after 1988. To be sure, *Owen* cast doubt on *Pitman's* continued validity by criticizing its failure to recognize hori-

11. Plaintiffs point out that they cannot make a final accounting until the erosional damage is complete. How, they ask, could we anticipate contingencies such as continued erosion, maintenance dredging, changes to the port, etc.? While resolution of defendant's motion does not require that this question be answered, one response is that courts wrestle with such problems in the damages phase of many cases. Expert testimony is designed to address just such questions.

zontal limits to easements and navigational servitudes. 851 F.2d at 1412–15. However, the Court of Claims recognized that "a plaintiff cannot toll limitations by waiting for other cases to be litigated and decided.... [because those] cases did not create a new claim for the plaintiff...." *Copenhaver v. United States*, 225 Ct.Cl. 619, 620 (1980) (citing *Sharp v. United States*, 207 Ct.Cl. 975, 976–77 (1975)). Assuming that by 1972 the limitations period had not already run, Mr. Pitman should have appealed the court's adverse decision at that time. A decision from the court countenancing plaintiffs' theory would open the court to a deluge of stale claims. Of course, this is precisely what the congressionally mandated limitations period seeks to prevent.

Given the court's disposition of the statute of limitations issue, allowing plaintiffs to amend their complaint to eliminate the request that the Corps be ordered to construct a sand transfer facility would be futile. *See Mitsui Foods, Inc. v. United States*, 867 F.2d 1401, 1403–04 (Fed.Cir. 1989); *Tyger Constr. Co. v. United States*, 28 Fed.Cl. 35, 54 (1993). Finally, although *Pitman* is no longer good law on whether a taking occurred in the Port Canaveral area, the court relies on it only to take judicial notice that a plaintiff in this case sued on the same cause of action over 22 years ago.

## CONCLUSION

Accordingly, based on the foregoing, defendant's motion to dismiss is granted, and the Clerk of the Court shall enter judgment dismissing plaintiffs' complaint.

No costs.